**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　*Plaintiff-Appellee,*

　　　　v.

CLYDELL YOUNGER,
　　　　　　*Defendant-Appellant.*

No. 04-10206

D.C. No.
CR-03-00045-MMC

OPINION

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, District Judge, Presiding

Argued and Submitted
January 12, 2005—San Francisco, California

Filed March 1, 2005

Before: John T. Noonan, Consuelo M. Callahan,
Circuit Judges, and Robert E. Jones, District Judge.*

Opinion by Judge Jones

---

*The Honorable Robert E. Jones, Senior United States District Judge
for the District of Oregon, sitting by designation.

**COUNSEL**

Daniel P. Blank, Office of the Public Defender, San Francisco, California, for the defendant-appellant.

Kevin V. Ryan, United States Attorney, Hannah Horsley and Susan R. Jerich, Assistant United States Attorneys, San Francisco, California, for the plaintiff-appellee.

**OPINION**

JONES, District Judge:

Clydell Younger appeals his jury conviction for possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), and for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Defendant asserts that (1) the district court erred in denying his motion to suppress statements; (2) the district court erred in permit-

ting certain expert opinion testimony; (3) the prosecutors engaged in prejudicial misconduct during closing argument; (4) the Second Amendment bars prosecution for felon in possession; and (5) the evidence failed to satisfy the "interstate commerce" element of the felon-in-possession charge.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

I.   Facts

On November 18, 2002, police officers Hall and Benzinger, assisted by other officers, executed a warrant to search defendant's person, residence, and vehicle. The warrant was based on information Hall and Benzinger received from a confidential informant that defendant was selling crack cocaine from his residence.

After knocking and announcing their presence, the officers heard loud thumps of someone running inside the residence, and forced entry. After entry, Hall found defendant in an upstairs bedroom. Defendant was standing next to an open window with his right arm outside the window. He was wearing a light blue sweat suit and breathing heavily. Hall arrested defendant and placed him in handcuffs without incident. Hall then heard another officer call for his attention. The officer told Hall that "some guy wearing blue threw a backpack on the roof." Hall brought defendant to the window and the officer stated "[y]eah, that's the guy."

Officers retrieved the backpack and inside it found narcotics and firearms. Specifically, in the large compartment of the pack officers found a loaded, short-barrel shotgun with two loose rounds, a loaded revolver in a black holster, a replica machine gun with an unattached magazine, a black ski mask, a large folding knife, and a black glove. In the smaller compartment, officers found three plastic bags containing 81 smaller bags of crack cocaine, 17 smaller bags of powder

cocaine, and plastic sandwich bags. Laboratory analysis later revealed the total amounts of crack and powder cocaine to be 12.5 grams and 4.7 grams, respectively. Officers seized $162 in small denominations from defendant, and also found a large box of sandwich bags in defendant's kitchen with smaller bags inside the box.

After identification of defendant as the one who had thrown the backpack onto the roof, Hall brought him downstairs to the living room. There, Hall advised defendant of each of his *Miranda*[1] rights, including his rights to remain silent and to have an attorney present before and during questioning, and asked him if he understood. After every question, defendant affirmatively acknowledged that he understood each right.

Meanwhile, Benzinger had detained defendant's girlfriend upstairs.[2] Before Hall had an opportunity to question defendant, defendant spontaneously stated "that stuff is mine. She [the girlfriend] don't know about nothing." Hall then asked defendant if the backpack belonged to him. Defendant replied "everything in the backpack is mine and [she] don't know nothing about none of that stuff." Benzinger entered the living room with the backpack and asked defendant if the girlfriend knew anything about the guns in the bag. Defendant responded "everything in the bag is mine."

Officers then transported defendant to the police station, where he was interviewed. The interview was tape-recorded and lasted approximately 25 minutes. At the beginning of the interview the following colloquy took place:

Hall:          Don't trip, you're all good.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] Officers later released the girlfriend as she did not appear to be involved in criminal activity.

Benzinger:    Okay, this is Officer Benzinger, 356.

Hall:         Officer Hall, 567, the time right now
              is about, 11:15, and what's the date?

Benzinger:    The 18th of November.

Younger:      But, excuse me, if I'm right, I can
              have a lawyer present . . .

Hall:         (interrupting) If you want one.

Benzinger:    (interrupting) Yeah.

Younger:      . . . through all this, right?

Hall:         (interrupting) Yeah. Why don't we
              read your *Miranda* rights, yeah.

Younger:      Okay, yeah.

Benzinger then read defendant his *Miranda* rights, asking
after each statement whether defendant understood. Benzinger
did not interpret defendant's statement as a request for coun-
sel; rather, he considered it "simply him stating one of his
rights, and in fact, he was correct in that, and we told him that."[3]

   In the interview that immediately followed, defendant made
various statements, some that were inculpatory and some that
showed that he understood his rights, including the right to
have counsel present. For example, in response to a question
from Hall concerning the backpack, defendant stated:

---

[3]At trial, Benzinger testified that his reasons for again advising defen-
dant of his *Miranda* rights was to capture it on audio tape to create a per-
manent record and to prevent any ambiguity as to whether defendant
understood his rights.

The bag? I don't know about the bag. We'll talk about that in front of a lawyer or something, I don't want to say anything that will incriminate myself in court, you know what I'm saying?

While discussing the weapons found in the backpack, defendant stated: "You know, I don't want to say too much . . . ," to which Hall responded "[t]hat's cool, you know, you can set your own limits and that's totally fine with us." At another point in the interview, defendant stated:

Yeah, that's why when I walk, you know, pretty much, I'm here, we caught, you know, I know the officer's word is going to be against mine, so we might as well talk about it and get it out right here.

Later, defendant acknowledged

[y]eah, they seen me, they seen me throw it, I might as well get it out there, man, I ain't trying, what I'm take this to trial? You know what I'm saying? . . . I'm looking for a deal or something, I already know I'm looking at a lot of time.

Defendant was transferred to federal custody on February 3, 2003. On February 14, 2003, he was arraigned in federal district court on a three-count indictment charging him with possessing with intent to distribute five or more grams of cocaine base, felon-firearm possession, and possessing firearms in furtherance of a drug trafficking crime.

In pretrial proceedings, defendant moved to suppress the inculpatory statements he made while in custody at the residence and the police station. The court denied the motion. Defendant moved to dismiss the firearms-related charges as unconstitutional under the Second Amendment. The court denied the motion. Citing Federal Rule of Evidence ("FRE")

704(b),[4] defendant moved to preclude the government's expert witness, a police lieutenant, from offering any opinion regarding defendant's intent to distribute the narcotics he possessed. The court granted the motion in part and denied it in part, ruling that if the expert conformed his opinions to the requirements of FRE 704(b), his testimony would be admissible.

On October 7, 2003, the jury found defendant guilty on counts one and two of the indictment, and not guilty on count three. On March 31, 2004, the district court sentenced defendant to 120 months imprisonment, eight years supervised release, and a $200 special assessment. Defendant timely appeals.

## II. Denial of Motion to Suppress

We review the voluntariness of a waiver of *Miranda* rights de novo. *United States v. Okafor*, 285 F.3d 842, 846-47 (9th Cir. 2002). Whether the decision was knowing and intelligent is reviewed for clear error. *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998). We review the district court's factual findings concerning the words a defendant used to invoke the right to counsel for clear error and whether the words actually invoked the right to counsel de novo. *United States v. Ogbuehi*, 18 F.3d 807, 812 (9th Cir. 1994).

### a. *Miranda Waiver*

Defendant argues that custodial statements he made at his

---

[4]FRE 704(b) provides:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

residence and at the police station were taken in violation of his *Miranda* rights. His argument is two-fold. First, he argues that the police officers failed to obtain a valid waiver of his rights both at the house and the police station. Second, he contends that the police violated his rights by continuing to question him at the police station after he invoked counsel.

A defendant's waiver of *Miranda* rights must be "voluntary, knowing, and intelligent." *Garibay*, 143 F.3d at 536 (internal quotations and citations omitted). A valid waiver depends on the totality of the circumstances, where under the circumstances, defendant "was aware of 'the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Id.* (citation omitted).

A *Miranda* waiver need not be express. In soliciting a waiver of *Miranda* rights, police officers need not use a waiver form nor ask explicitly whether a defendant intends to waive his or her rights. *United States v. Cazares*, 121 F.3d 1241, 1244 (9th Cir. 1997).[5] There is, however, a presumption against waiver. *Garibay*, 143 F.3d at 536. The burden is on the government to prove voluntariness, but " 'voluntariness of a waiver' has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word.' " *Cazares*, 121 F.3d at 1244 (quoting *Colorado v. Connelly*, 479 U.S. 157, 170 (1986)).

The district court denied defendant's motion to suppress following an evidentiary hearing. The court found no express waiver, but found an implied waiver at the house based on evidence that after Officer Hall advised defendant of his *Miranda* rights but before questioning him, defendant made a

---

[5]As previously noted by this Circuit, the police officer's decision to forego the simple steps of reading the express waiver language on the back of the *Miranda* form and/or requesting an express waiver, while lawful, "resulted in unnecessary time and effort" and a waste of judicial resources. *Terronova v. Kincheloe*, 912 F.2d 1176, 1180 n.13 (9th Cir. 1990).

spontaneous statement and responded to further questioning without reference to counsel.

The court analyzed defendant's statements at the police station as a continued conversation at a new location that did not require another waiver. The court nonetheless found an implied waiver at the police station based on defendant's statements, which the court interpreted as his desire to clear his girlfriend of any blame. The court also commented that the officers, who re-advised defendant of his rights after he asked about counsel, responded to defendant in a way "that was not unfair."

Defendant does not dispute that he understood his rights but argues that the record is insufficient to overcome the presumption against waiver. Specifically, he argues that a valid *Miranda* waiver requires more than a finding that the suspect understood his rights and made inculpatory statements. Comparing himself to the defendant in *Terronova v. Kincheloe*, 912 F.2d 1176 (9th Cir. 1990), "an 'articulate and college-educated adult' " who had demonstrated an ability to assert his rights and was found to have made a valid implied waiver of his *Miranda* rights, 912 F.2d at 1179 (quoting the district court), defendant faults the district court for failing to make similar findings concerning his background, experience, and conduct. *See Garibay*, 143 F.3d at 536 (holding that the totality of the circumstances includes a defendant's background, experience, and conduct). Defendant further contends that his statement that the backpack belonged to him was not spontaneous, but resulted from the "functional equivalent" of interrogation when he was identified as the person who threw the backpack on the roof.

**[1]** With respect to the latter argument, the Supreme Court held in *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1979), that police actions can amount to the functional equivalent of questioning. The Court carved out an exception, however, for actions on the part of the police that are "normally attendant

to arrest and custody." *Id.* at 301. The police identification of defendant as the person who threw the backpack on the roof falls squarely within the "normally attendant to arrest and custody" category of police action. *Id.*

As to whether the district court erroneously failed to consider defendant's background, experience, and conduct, we clarified in *Cazares* that such findings are not always required to support a finding of implied waiver. 121 F.3d at 1244. In this case, unlike *Cazares*, there is no evidence that defendant had language difficulties. The police read each of his rights twice, and twice he confirmed that he understood each one. Nor is there evidence that the police coerced or misled defendant into making statements. To the contrary, defendant's own statements demonstrate an understanding of his rights and a desire to waive them.

**[2]** We conclude that the district court did not clearly err in finding that defendant's conduct in making a spontaneous statement and continuing to respond to questioning both at the house and the police station constituted an implied waiver.

b.   Request for Counsel

Relying on *Davis v. United States*, 512 U.S. 452 (1994), the district court found defendant's question, "[b]ut, excuse me, if I am right, I can have a lawyer present through all this, right?," to be ambiguous and therefore not sufficient to require the officers to stop questioning or to seek clarification. The court further found that nothing the police officers said after defendant's question was misleading.

**[3]** A suspect who invokes the right to counsel cannot be questioned unless an attorney is present or the suspect reinitiates the conversation. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). *Edwards* requires courts to "determine whether the accused *actually invoked* his right to counsel." *Davis*, 512 U.S. at 458 (internal quotations and citations omitted; empha-

sis in original). The inquiry is objective. *Id.* at 459. At a minimum, invocation of the right to counsel requires "some statement that reasonably can be construed to be an expression of a desire for the assistance of an attorney." *Paulino v. Castro*, 371 F.3d 1083, 1087 (9th Cir. 2004) (internal quotations and citation omitted). To invoke the right to counsel, a suspect must "unambiguously" request counsel:

> reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel . . . do[es] not require the cessation of questioning.

*Davis*, 512 U.S. at 459 (emphasis in original); *accord Paulino*, 371 F.3d at 1087.

In *Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003), a habeas case, we acknowledged that "[o]ur own precedent is not much help since it is somewhat inconsistent on what constitutes an equivocal request for a lawyer." Based on a comparison of defendant's statement to those found by the Supreme Court and this court to be equivocal, however, we conclude that the district court did not clearly err in finding defendant's statement to be ambiguous.

**[4]** In *Davis*, for example, the suspect waived his right to counsel but later said "[m]aybe I should talk to a lawyer." 512 U.S. at 455. The Supreme Court held that the statement was not an unambiguous request for counsel that required questioning to stop. *Davis*, 512 U.S. at 462; *see also Paulino*, 371 F.3d at 1087 ("[w]here's the attorney" and "[y]ou mean it's gonna take him long to come?" not unambiguous requests for counsel); *Clark*, 331 F.3d at 1071 ("I think I would like to talk to a lawyer" not an unambiguous request for counsel); *United States v. Doe*, 170 F.3d 1162, 1166 (9th Cir. 1999) ("[w]hat time will I see a lawyer?" not an unambiguous request for counsel).

By comparison, in *Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir. 1999), we concluded that, when considered together, a suspect's three questions — " '(1) Can I get an attorney right now, man?; (2) You can have attorney right now?; and (3) Well, like right now you got one?' " — constituted an unambiguous request for counsel. In *United States v. Cheely*, 36 F.3d 1439, 1448 (9th Cir. 1994), we held that a suspect's comment that "my attorney does not want me to talk to you" in tandem with a refusal to sign a written waiver of the right to an attorney was an unambiguous request for counsel.

Defendant urges that his single declarative statement is comparable to the suspect's three questions in *Alvarez*, but we disagree. Alvarez asked "Can I get an attorney right now?" — a direct question that "reasonably may be construed to be an expression of a desire for the assistance of an attorney." *Alvarez*, 185 F.3d at 998. Moreover, it was "Alvarez's thrice-repeated questions, when considered together," that led this court to conclude the questions constituted an unequivocal request for an attorney. *Id.*

**[5]** Because defendant's words did not unambiguously invoke the right to counsel, the district court did not err in denying the motion to suppress.

III.   Admission of Expert Opinion Testimony

We review a district court's decision to admit expert testimony for an abuse of discretion. *United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000). We reverse a district court's evidentiary rulings only if "manifestly erroneous." *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000).

Defendant argues that the government's expert witness directly commented on his criminal intent in violation of FRE 704(b). Defendant also argues that the government's hypothetical questions were improper.

The government proffered a police lieutenant as an expert in the methodology of possession, use, manufacture, and distribution of illicit narcotic substances. In a letter outlining the proposed testimony, the government represented that based on a hypothetical set of facts, the expert would describe the factors that are relevant to an opinion "that narcotics were more likely possessed for sale or more likely possessed for personal use . . . ." In a pretrial ruling, the district court allowed the testimony provided the expert did not state an opinion that defendant possessed the drugs with intent to distribute them.

At trial, the expert testified in relevant part as follows:

Q:   Just to make it clear, you don't have any particular knowledge of this defendant or what his intent might have been on any day in the past in connection with his activities, is that correct:

A:   That's correct.

Q:   . . . Now let's talk about the 81 pieces of crack cocaine. If you assume for a moment that they weigh an average of .15 grams apiece and that they are 81 in number, based upon your training and experience, do you draw any conclusions about whether — for what purpose that a person might possess them?

A:   Yes, I do.

Q:   And what conclusion do you draw, sir?

A:   That the individual that possessed these, or shall I say, I've never known an individual to possess these rocks in this size, shape and consistency for personal use. I've only come in contact with an individual possessing this much narcotics, in this size, shape, and consistency, for the purposes of sale.

* * *

Q: . . . Now, if you assume for the moment that those 81 rocks were tested and, as a composite, all together, were measured to be 68 percent pure cocaine base, is that a factor that would enter into your opinion in any way?

A: Yes. Based upon the purity, at street level, crack cocaine, it's a very potent percentage. Usually we see crack cocaine between, you know, 50 percent or so, which is quite common. So 68 is significant.

Just the mere number, in and of itself, is a significant fact, in and of itself. I've never seen anyone possess this much crack for any other reason other than to sell it.

Q: All right, and in connection with the other side of [the] picture, the 18 bags, if you assume for a moment that those 18 bags each contain approximately .26 grams of cocaine hydrochloride, does that factor affect — is that a significant factor in you coming to your conclusion? Does that push towards a sale or push towards personal use?

A: I've never known anyone to possess this much narcotics for personal use.

Q: Now —

A: *The person, individual, whoever possessed this, possessed it for the purposes of selling.*

(Emphasis added.) Defense counsel objected at this point and was overruled. The testimony continued, and the prosecutor posed this hypothetical question:

Q: . . . [A]ssume for a moment that there is found inside a residence a backpack with . . . 81 rocks of cocaine base, 18 bags of cocaine, inside the same container a sawed-off shotgun, a replica submachine gun, a Smith & Wesson .357 caliber revolver, both of them real guns, loaded, does the absence of any of the items that we've discussed here named in the search warrant, or the absence of most of them, detract from your opinion that that amount of cocaine, particularly in the presence of the firearms and wrapped the way it's been depicted here, was in fact, possessed for sale?

Defense counsel again objected and was overruled. The expert did not answer the question. Instead, the prosecutor continued questioning:

Q: Has it ever come to your attention during your 26-odd years as a police officer that any crack user who was not also a dealer has ever been found in possession of a — of 81 rocks of crack cocaine?

A: No.

Q: Have you ever, in your 26 years as a police officer, heard of a user of crack cocaine who possessed at one time a two-week supply with the idea of just storing it up so that he would — he or she would have a two-week supply available?

A: No.

Q: A one-week supply?

A: No.

Q: A three-day supply?

A:  No.

**[6]** FRE 704(b) bars an expert from stating "an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged . . . ." The rule does not bar testimony supporting an inference or conclusion that a defendant does or does not have the requisite mental state, "so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony." *United States v. Morales*, 108 F.3d 1031, 1038 (9th Cir. 1997); *see also United States v. Gonzales*, 307 F.3d 906, 911-12 (9th Cir. 2002) (allowing a narcotic agent's testimony that the " 'person' possessing the evidence in question would, in fact, possess the drugs for the purpose of distributing" because it did not compel the jury to reach a particular conclusion); *United States v. Gomez-Norena*, 908 F.2d 497, 502 (9th Cir. 1990) (affirming the admission of a DEA agent's testimony — that in his opinion the possession of $200,000 worth of cocaine was consistent with an intent to distribute rather than with possession for personal use — because "[a]t no time did [the DEA agent] give his opinion of what [defendant] actually thought").

**[7]** In this case, the police lieutenant testified only that the "person" or "individual" who possessed the quantity of drugs at issue possessed it for the purpose of selling it. He expressly denied having any particular knowledge about defendant or what his intent may have been. Thus, his testimony did not violate FRE 704(b) and the district court did not err in admitting it.

**[8]** Defendant further contends that the prosecutor's hypothetical questions were improper because they "mirrored" the alleged facts. Defendant concedes, however, that the government may ask an expert hypothetical questions regarding the intent to distribute narcotics of a typical person in roughly the same situation as the defendant. *See Gonzales*, 307 F.3d at

911-12 (upholding admission of expert testimony that the fact pattern in the case was consistent with an intent to distribute). Although the prosecutor's questions brought the testimony close to Rule 704(b)'s line of prohibition, the expert never directly commented on *defendant's* mental state, and the jury could have accepted his testimony and still infer that defendant was atypical. Thus, we conclude that the district court did not abuse its discretion in admitting the testimony.

IV.   Prosecutorial Misconduct

Where counsel objects to alleged acts of prosecutorial misconduct, we review for harmless error. *United States v. Cabrera*, 201 F.3d 1243, 1246 (9th Cir. 2000). A claim of prosecutorial misconduct is viewed in the entire context of the trial, and "[r]eversal on this basis is justified only if it appears more probable than not that prosecutorial misconduct materially affected the fairness of the trial." *Id.* (internal quotations and citations omitted); *accord United States v. Toomey*, 764 F.2d 678, 681 (9th Cir. 1985) (determining that any error in a prosecutor's statement will not require reversal "unless it is more probable than not that the error materially affected the verdict").

Defendant contends that the prosecutors[6] materially prejudiced his trial by improperly vouching for his guilt during closing argument in three ways: by stating a belief that defendant possessed the cocaine for sales purposes, by using the phrase "we know" in summarizing facts showing defendant's guilt, and by making reference to the district court's pretrial rulings.

Improper vouching " 'consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not

---

[6]Two prosecutors shared the closing arguments. For ease of reference, we will refer to them in the plural as "prosecutors."

presented to the jury supports the witness's testimony.' " *United States v. Leon-Reyes*, 177 F.3d 816, 822 (9th Cir. 1999) (quoting *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993)). "It is not misconduct for the prosecutor to argue reasonable inferences based on the record." *Cabrera*, 201 F.3d at 1250 (internal quotations and citation omitted).

**[9]** Defendant first points to the prosecutors' statement, in addressing count one, that "the government believes that he did possess cocaine and cocaine base for sales purposes." Defense counsel immediately objected to that statement, and the court sustained the objection. The prosecutors immediately rephrased it, stating "[w]hat the evidence will show is that [defendant] possessed 81 rocks of cocaine base and 18 bags of powder for sales purposes," and continued with closing argument. In view of the prosecutors' immediate rephrasing of the statement and in the context of the trial as a whole, we conclude that the single improper expression of belief did not materially affect the verdict and was, therefore, harmless. *Toomey*, 764 F.2d at 681.

Defendant also contends that the prosecutors improperly vouched by repeatedly using the phrase "we know" in summarizing the facts showing guilt, *e.g.*, "[w]e know [defendant] possessed the backpack. We know that. We know inside the backpack were the 81 rocks wrapped for retail sale and the 18 packets of cocaine powder also wrapped for sale" and "[w]e know that in the neighboring compartment, the bigger compartment, they had two loaded firearms." Defense counsel objected to the use of "we know" as suggestive. After determining that the prosecutors meant " 'we know' from the evidence collectively," the district court overruled the objection.

**[10]** We do not condone the prosecutors' use of "we know" statements in closing argument, because the use of "we know" readily blurs the line between improper vouching and legitimate summary. The question for the jury is not what a prosecutor believes to be true or what "we know," rather, the jury

must decide what may be inferred from the evidence. We emphasize that prosecutors should not use "we know" statements in closing argument.

**[11]** Nonetheless, the record in this case confirms that the prosecutors used the phrase "we know" to marshal evidence actually admitted at trial and reasonable inferences from that evidence, not to vouch for witness veracity or suggest that evidence not produced would support a witness's statements. *Leon-Reyes*, 177 F.3d at 822. The prosecutors' statements thus were not improper. *Cabrera*, 201 F.3d at 1250; *Toomey*, 764 F.2d at 681. Moreover, in the context of the entire trial, we conclude that the prosecutors' use of "we know" did not materially affect the verdict. *See Toomey*, 764 F.2d at 681.

Defendant also contends that the prosecutors' references to the court's in limine rulings improperly suggested that the admitted evidence was reliable. The relevant portions of closing argument are as follows:

> Prosecutor:  . . . The police officer's job, interview a suspect. Do so in a lawful constitutional way, which is what they did in this case. Because let me assure you, ladies and gentlemen, if they hadn't, her honor is a gatekeeper —
>
> The Court:   Excuse me. You are not to refer to any rulings that the court has made.
>
> * * *
>
> The Court:   You can refer to what the court has done in the courtroom, but not what the court has done elsewhere.

During the rebuttal portion of the government's closing argument, the following took place:

Prosecutor:   [I]n terms of the corroboration of what happened that day and what, in fact, the actions of the defendant mean, we can turn to the defendant's statement.

Counsel suggests there was unfairness in the fact that the defendant asked:

"A.   But excuse me. If I'm right, I can have a lawyer present?"

"Q.   If you want one."

"A.   Yeah."

And then it goes on and he was fully read his Miranda rights.

This court has ruled that —

The Court:   Excuse me, Mr.

Defense Counsel: Objection, Your Honor.

The Court:   I have already admonished [the other prosecutor] about this . . . . I trust you were paying attention to her closing argument and the court's remarks during them.

There are to be no references by any counsel to any ruling that the court has made other than rulings possibly, if you could work them into your argument in some legitimate way, that were made here in open court.

\* \* \*

The Court:          And in most instances no counsel should be making any references to the court's rulings.

Defense Counsel:    Could the court offer a corrective instruction that it is the jury's place to determine the voluntariness of the statement, Your Honor?

Prosecutor:         The court ruled —

Defense Counsel:    Objection, Your Honor.

The Court:          [To the prosecutor] in a moment I'm going to send the jury out. This is not a matter for discussion, all right?

Is it your intent to make reference to matters that are contrary to the ruling that I just made?

Prosecutor:         No, Your Honor.

The Court:          Fine. All right.

Ladies and gentlemen, you ultimately will be the determiners of all facts that are presented to you and all issues that are raised.

So that in this instance to the extent that there were any remarks made by the defendant or by the officers themselves that bear in any way on his state of mind as you view it in reviewing his interview on tape, you may consider those.

Ultimately the decisions will be yours as to the significance of anything that he did say in the course of that.

**[12]** Thus, the district court cut off the prosecutors' comments before any pretrial rulings were revealed, and gave the jury the curative instruction defense counsel requested. The district court's attentiveness and swift corrective action thus prevented the prosecutors' improper comments from materially affecting the verdict, and the prosecutors' misconduct in referring to the court's rulings was harmless.

V.   Felony-Firearm Possession

Before trial, defendant moved to dismiss the firearm-related counts as unconstitutional under the Second Amendment. The district court denied the motion. During trial, defendant requested a modified version of Ninth Circuit Model Instruction 8.59, which instructs on the elements of 18 U.S.C. § 922(g), to require the jury to find that defendant possessed the firearms "in or affecting" interstate commerce. The court denied the request, and also denied defendant's motion for judgment of acquittal based on sufficiency of the evidence of interstate commerce.

The constitutionality of a statute is a legal question of law that we review de novo. *See United States v. Jones*, 231 F.3d 508, 513 (9th Cir. 2000). We review a district court's jury instructions regarding the elements of a statutory crime de novo. *United States v. Rivera-Belle*, 322 F.3d 670, 674 (9th Cir. 2003). Where defendant preserves a claim of insufficient evidence by moving for acquittal at the close of evidence, we review denial of the motion de novo. *United States v. Munoz*, 233 F.3d 1117, 1129 (9th Cir. 2000).

Based on our current case law, defendant's Second Amendment challenge to the constitutionality of § 922(g) is without merit. *See Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002) (ruling that the Second Amendment does not confer an individual right to possess arms), *cert. denied* 540 U.S. 1046 (2003); *see also United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004) (rejecting a Second Amendment challenge to

the felon-firearm possession statute and holding that § 922(g)(1) "represents a limited and narrowly tailored exception to the freedom to possess firearms, reasonable in its purposes and consistent with the right to bear arms protected under the Second Amendment").

Defendant's argument that the jurisdictional element of § 922(g) requires proof that the firearm either recently moved across state lines or that defendant's conduct had an actual economic impact likewise lacks merit: "A one-time past connection to interstate commerce is sufficient under § 922(g)(1)." *United States v. Beasely*, 346 F.3d 930, 936 (9th Cir. 2003); *see also United States v. Casterline*, 103 F.3d 76, 77 (9th Cir. 1996).

Defendant relies on *United States v. Morrison*, 529 U.S. 598 (2000), and *United States v. Lopez*, 514 U.S. 549 (1995), characterizing those cases as fatally undermining the model instruction's approach to the jurisdictional element. This court has, however, expressly and repeatedly rejected defendant's reading of the law, even after *Morrison* and *Lopez* were decided.[7] *See, e.g.*, *United States v. Rousseau*, 257 F.3d 925, 932-33 (9th Cir. 2001) (finding past connection to interstate commerce sufficient for § 922(g) conviction). The evidence in this case was undisputed that defendant's guns were manufactured in Massachusetts and found in California. Consequently, the district court's jury instruction was proper and the evidence sufficient to sustain defendant's conviction on count two.

**AFFIRMED.**

---

[7]Neither the Gun-Free School Zones Act, 18 U.S.C. § 922(q), invalidated in *Lopez*, nor the Violence Against Women Act, 42 U.S.C. § 13981, invalidated in *Morrison*, contained a jurisdictional element to ensure that the prohibited acts affected interstate commerce. *See generally Morrison*, 529 U.S. 598, and *Lopez*, 514 U.S. 549; *accord Jones*, 231 F.3d at 514 (affirming constitutionality of § 922(g) and distinguishing *Lopez* and *Morrison*).