**Electronically Filed
Intermediate Court of Appeals
CAAP-24-0000509
27-FEB-2026
08:16 AM
Dkt. 108 MO**

NO. CAAP-24-0000509

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

STATE OF HAWAIʻI, Plaintiff-Appellee,
v.
SCOTT DAVID DEANGELO, Defendant-Appellant.

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NOS. 1CPC-22-0001357 and 1CPC-23-0000307)

MEMORANDUM OPINION
(By: Wadsworth, Presiding Judge, McCullen and Guidry, JJ.)

Defendant-Appellant Scott David **Deangelo** appeals the Circuit Court of the First Circuit's July 18, 2024 Judgments of Conviction and Sentence, convicting Deangelo of Murder in the Second Degree for causing the death of his roommate, Demond L. **Cox**, and Arson in the First Degree for setting fire to Cox's apartment.[1]  On appeal, Deangelo alleges prosecutorial misconduct

---

[1]  The Honorable Kevin A. Souza presided.

Following a consolidated trial, Deangelo was convicted of Murder in the Second Degree in case number 1CPC-22-0001357 and Arson in the First Degree in case number 1CPC-23-0000307.

so egregious that his convictions should be reversed and reprosecution barred. We vacate and remand.

## I. BACKGROUND

Cox's charred remains were recovered from his Pearl City apartment, where he died of a knife wound to the neck. Because there were no percipient witnesses to the events in the apartment apart from Deangelo and Cox, the State relied on circumstantial evidence to prove its case.

The State's theory was that on the evening of February 7, 2022, Cox and Deangelo got into a physical altercation because Cox wanted Deangelo to move out of the apartment. Ultimately, Deangelo stabbed Cox in the throat and torched the apartment to destroy evidence. Deangelo then fled the scene by jumping out of the apartment's fourth-story window.

The day after the incident, Deangelo was apprehended in Hau'ula with a handgun.

Deangelo, who testified as the sole witness in his defense, admitted to killing Cox but claimed he acted in self-defense after Cox set the apartment on fire and attacked him with the handgun.

The jury found Deangelo guilty as charged. The circuit court sentenced Deangelo to life imprisonment with the possibility of parole in 1CPC-22-0001357 and twenty years imprisonment in 1CPC-23-0000307, to be served concurrently.

2

## II.  DISCUSSION

On appeal, Deangelo contends the Deputy Prosecuting Attorney (**DPA**) committed prosecutorial misconduct by (1) making improper statements during closing and rebuttal, and (2) offering his personal opinion when repeatedly using the phrase "we know."  Deangelo also contends these improper statements were not harmless, but were in fact so egregious that the State should be barred from reprosecuting him.  As discussed below, three statements and the repeated use of "we know" in these circumstances were improper.

## A.    Three Statements Were Improper

Deangelo contends the DPA's statements were improper "because they were made without any basis in the evidentiary record" or were misstatements of the law.

"Prosecutorial misconduct" is "a legal term of art that refers to any improper action committed by a prosecutor, however harmless or unintentional."  State v. Willis, 156 Hawaiʻi 195, 204, 572 P.3d 668, 677 (2025) (quoting State v. Udo, 145 Hawaiʻi 519, 534, 454 P.3d 460, 475 (2019)).  "Whenever a defendant alleges prosecutorial misconduct, this court must first decide:  (1) whether the conduct was improper; and (2) if the conduct was improper, whether the misconduct was harmless beyond a reasonable doubt."  Id. (internal quotation marks

omitted) (quoting Udo, 145 Hawai'i at 534-35, 454 P.3d at 475-76).

"It is well-established that prosecutors are afforded wide latitude in closing to discuss the evidence, and may state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence." Id. (brackets and internal quotation marks omitted) (quoting Udo, 145 Hawai'i at 536, 454 P.3d at 477). "An inference is reasonable when 'the evidence bears a logical and proximate connection to the point the prosecutor wishes to prove.'" Id. (quoting State v. Basham, 132 Hawai'i 97, 112, 319 P.3d 1105, 1120 (2014)).

In reviewing the challenged statements "in context of the DPA's entire closing argument and the trial record as a whole," the following three statements were improper. See id. at 206, 572 P.3d at 679.

> **(1)  "He gave the defendant a target move-out date. And we know that that target move-out date should have been that day."**

Deangelo argues this statement was "pure speculation, completely unattached from the evidence presented at trial," and "there was no evidence that Cox told Deangelo to move out at all, let alone that there was a date discussed."

Cox's aunt, Nicole Richardson, testified that on January 10, 2022, approximately one month before Cox's death, Cox sent her an Instagram message to the effect that "he was

4

living with another person[,]" "he intended to have that other person move out[,]" and he was going to give "the other person . . . "a target move-out date[.]" Additionally, Julian Rosario, a friend of Cox, testified that he was visiting Hawai'i from California with another friend, and that "[t]he plan was for me to come over and possibly stay over with [Cox] . . . at his house."

There was no evidence adduced to show that the "target move-out date should have been that day," which was February 7, 2022. And by using "we know," the DPA implied that the move-out date was an uncontroverted fact — one that was known to the prosecution and that explained why Deangelo killed Cox that day. But there was no logical and proximate connection between the evidence adduced and knowing that the move-out date was February 7, 2022.

Thus, the DPA's statement that "we know that that target move-out date should have been that day" was improper. There was no objection and, thus, no curative instruction.

**(2)    "The defendant pulled a gun on Demond Cox, tried to kill him."**

Deangelo argues that "[n]o evidence supports the claim that [he] possessed a gun prior to or during the incident, and certainly not that he used the gun in an attempt to kill" Cox.

The evidence showed that Deangelo had a gun in hand at several points, including when Aubrey Barnes saw him in the hallway, when Kevin Shim and others saw him exit the apartment from the fourth-story window, and at the time of his arrest. The evidence also showed that there was a physical fight and Cox was killed with a knife. But there was no logical and proximate connection between this evidence and the DPA's statement inferring Deangelo tried to kill Cox with the gun. And by inferring Deangelo tried to kill Cox with the gun prior to stabbing Cox, the State provided evidence that could establish Deangelo's state of mind for murder and tends to disprove Deangelo's justification defense.

Thus, the DPA's statement that "[t]he defendant pulled a gun on Demond Cox, tried to kill him" was improper. There was no curative instruction.

**(3) "The presumption of innocence is gone."**

Deangelo argues that the DPA misstated the law during rebuttal when the DPA argued, "The presumption of innocence is gone":

> [DPA:] At the beginning of [Defense Counsel]'s closing arguments, he talked to you about the law and tried to stress and appeal to your passion and prejudice or -- passion and pity for the defendant, talking about the oaths that you took, the presumption of incident -- innocence.
>
> The presumption of innocence is gone. It was gone when the State produced the evidence that shows that the defendant is guilty beyond a reasonable doubt.

6

> [Defense Counsel]: Objection, your Honor, that's a misstatement of the law.
>
> THE COURT: Yeah. I -- um -- I understand it's argument. I'm gonna sustain the objection, Mr. [DPA]. Um -- I'm gonna strike your last portion of your argument. The jury shall disregard that.
>
> Perhaps if you wanna restate another way, sir.

(Emphasis added.)

"[A] criminal defendant has a constitutional right to a presumption of innocence." State v. Samonte, 83 Hawaiʻi 507, 518-19, 928 P.2d 1, 12 (1996), abrogated on other grounds by, State v. Lavoie, 156 Hawaiʻi 250, 262, 573 P.3d 633, 645 (2025). Prejudicial misstatements of law during closing arguments may constitute prosecutorial misconduct. See State v. Espiritu, 117 Hawaiʻi 127, 142-44, 176 P.3d 885, 900-02 (2008).

Here, the DPA's statement that "[t]he presumption of innocence is gone" was improper. Deangelo objected, and the circuit court properly sustained the objection and struck the misstatement. "We presume 'that jurors are reasonable and generally follow the instructions they are given.'" State v. Sing, 154 Hawaiʻi 377, 387, 550 P.3d 1235, 1245 (2024) (quoting State v. Holbron, 80 Hawaiʻi 27, 46, 904 P.2d 912, 931 (1995)). Deangelo has not rebutted that presumption. See id.

**B. The Repeated Use of "We Know" Was Improper Under These Circumstances**

Deangelo also contends the DPA's repeated use of the expression "we know" was improper, because it injected personal

opinions not in evidence and "tell[s] the jury that the conclusions have already been drawn by the DPA, and that jurors can simply rely on the State's version of the facts."

"The prosecutor should not argue in terms of counsel's personal opinion, and should not imply special or secret knowledge of the truth or of witness credibility." State v. Browder, 154 Hawaiʻi 237, 241, 549 P.3d 322, 326 (2024) (emphasis omitted) (quoting A.B.A., Crim. Just. Standards for the Prosecution Function, Standard 3-6.8(b) (4th ed. 2017)). "When prosecutors imply secret knowledge, they imply extra facts not in evidence." Id.

To its credit, the State readily acknowledges in its answering brief "it is not the best practice to use the turn of phrase 'we know' when discussing the evidence." See, e.g., United States v. Younger, 398 F.3d 1179, 1191 (9th Cir. 2005) ("We do not condone the prosecutors' use of 'we know' statements in closing argument, because the use of 'we know' readily blurs the line between improper vouching and legitimate summary. The question for the jury is not what a prosecutor believes to be true or what 'we know,' rather, the jury must decide what may be inferred from the evidence."), abrogated on other grounds by, United States v. Duarte, 101 F.4th 657 (9th Cir. 2024).

The occasional use of "we know" does not rise to the level of prosecutorial misconduct where, "under the facts and

8

circumstances of [each] case, [they are] permissible turns of phrase uttered in sentences drawing reasonable inferences from the trial evidence."  State v. Brown, 157 Hawaiʻi 354, 382, 577 P.3d 1045, 1073 (2025); cf. Willis, 156 Hawaiʻi at 206-07, 572 P.3d at 679-80 (concluding DPA's argument that "we know" was not improper because it was "based on reasonable inferences from the evidence"); State v. Tran, No. CAAP-25-0000006, 2026 WL 227043, at *6 (Haw. App. Jan. 28, 2026) (SDO) ("We therefore conclude that the prosecutor's usage of 'we' and 'us' was not improper when considered within the context of the prosecutor's statements, the evidence presented, and the reasonable inferences that a jury could draw from the evidence.").

For example, in Brown, the Hawaiʻi Supreme Court noted the DPA used "we know" once at closing and several more times at rebuttal.  157 Hawaiʻi at 364, 380, 557 P.3d at 1055, 1071. There, the occasional use of "we know" was not improper, because the DPA's argument neither "involved a prosecutor's significant departure from the evidence presented" nor "use[d] the weight of the office to go beyond the evidence adduced at trial into irrelevant and novel opinions or personal experiences of the DPA."  Id. at 381, 577 P.3d at 1072 (distinguishing the facts of that case from those in State v. Conroy, 148 Hawaiʻi 194, 202-06, 468 P.3d 208, 216-20 (2020)).  Instead, the Hawaiʻi Supreme Court recognizes that "[j]urors have the commonsense ability to

distinguish between an inartful choice of words and a blatant misrepresentation of the record." Willis, 156 Hawaiʻi at 206, 572 P.3d at 679.

Here, however, the record shows the DPA used some form of "we know" approximately twenty-five times during closing and rebuttal for varying effects, including (1) characterizing witness testimony; (2) drawing inferences therefrom; and (3) arguing the State's theory of the case:

- "If you go to the system time of 19:54, 30 seconds, you'll see the defendant walk through the garage. We know from the testimony that the actual time is approximately 13 to 14 minute difference. So that puts us at 8:07 p.m." (Emphasis added.)

- "We don't know exactly what happened between 8:12 and 8:30, but we do know that there was an argument. We heard that testimony from the Cambras." (Emphases added.)

- "We know that at some point that argument escalated and turned physical. We know that through the testimony of Kyra Fong and Thomas Mills, who were in unit 307, the unit directly below unit 407. . . . And at that time, the State submits that that is when the defendant pulled a gun on Demond Cox." (Formatting altered and emphases added.)

- "That is what Kyra and Thomas heard. We know that during that struggle it ended with what Thomas Mills described as agonal screaming." (Emphasis added.)

- "We know that the defendant panicked. He tried to run. He left unit 407 -- or tried to leave unit 407, but got caught, by Aubrey Barnes." (Emphasis added.)

- "She closes the door -- or she goes back in and closes the door.  That's when we know the defendant puts the mattress on the fire where Demond's body is."  (Emphasis added.)

- "The fire starts to get bigger.  Because we know that because right after Susan checks out her door, she tells her husband.  Eugene goes out, looks, and now the fire is starting to go."  (Emphasis added.)

- "At the same time, during the pop pop pops, Kyra is texting Raymond Souza.  And we know that text occurred at 8:50 p.m.  Again, all of this testimony lines up with the physical evidence."  (Emphasis added.)

- "You see the store clerk, look, something across the street.  She looks to her right.  We know from the testimony that that's Pearlita Fuavai saying call the police."  (Emphasis added.)

- "And we know that the system time on the garage surveillance from unit -- or from 906 Lehua Avenue is accurate because you could line it up." (Emphasis added.)

- "We know that Kevin Shim tries to help him.  But Kevin Shim walks away because he tells -- the defendant tells him to get back, get back." (Emphasis added.)

- "We may not know exactly what happened in unit 407, but we know that the defendant knew what he did was wrong.  We know because all the evidence of consciousness of guilt.  We have the testimony of Aubrey Barnes, when he interacted with the defendant in the hall."  (Emphases added.)

- "We know from the testimony of Kevin Shim, who tried to help the defendant when he jumped out of the window.  And after Kevin Shim yelled called the police, what did the defendant do?  Pulled out a gun.  Said get back, get back."  (Emphasis added.)

- "One thing I'll point out here is we know that he tried to get rid of the evidence on his right hand, because as you can see here, there was one ring that was recovered.  And it came from his left hand."  (Emphasis added.)

- "Some other inconsistencies in defendant's testimony.  He said that Demond held the gun at him.  We know from the testimony of Shannon Klum that only Scott DeAngelo's [sic] DNA profile matched the DNA sample obtained from the trigger and that Demond Cox was excluded."  (Emphasis added.)

- "We know that Demond fell or jumped from unit 407.  If you look closely where he landed, you see all these branches protruding out.  I'll leave it to you to decide whether those cuts on his arm look like they're from a knife or from falling onto this jagged bush."  (Emphasis added.)

- "He says he doesn't grab his cell phone.  Why?  We -- we don't know."  (Formatting altered and emphasis added.)

- "He comes here to get his bag.  We know that his bag was there [be]cause he said that's where he put it on the dresser.  And he expects you to believe that he didn't see in Demond there."  (Emphasis added.)

- "We know that didn't happen because there was no evidence of it.  Instead, the firefighter investigator told you, and it was corroborated by the medical examiner, that Demond must have been dead by the time that the fire started."  (Emphasis added.)

- "There was no smoke in his lungs.  None -- no other part except for his exterior was burned.  <u>We know</u> that his clothes, the back of his shirt, his shorts, if you look through the photos, are preserved, because he was laying down when that fire started." (Emphasis added.)

- "<u>We know</u> that the area of origin was at Demond's feet, and <u>we know</u> that the fire debris at Demond's Feet was intertwined with Demond's legs."  (Emphases added.)

- "He gave the defendant a target move-out date.  And <u>we know</u> that that target move-out date should have been that day."  (Formatting altered and emphasis added.)

Some of these "we know" statements were tied to the evidence presented at trial, but others were not or were at best tenuous inferences from the evidence presented.  When taking these numerous "we know" statements "in context of the DPA's entire closing argument and the trial record as a whole," these statements were improper because, as a whole, they impermissibly used the weight of the office to bolster the State's case.  <u>See</u> <u>Willis</u>, 156 Hawaiʻi at 206, 572 P.3d at 679; <u>Browder</u>, 154 Hawaiʻi at 241, 549 P.3d at 326 ("A prosecutor's assertions of personal knowledge 'are apt to carry much weight against the accused when they should properly carry none.'") (citation omitted); <u>Brown</u>, 157 Hawaiʻi at 381, 577 P.3d at 1072.

The main thrust of the State's argument at closing, which was repeated throughout, was that they did not know

exactly what happened in Cox's apartment, but that the circumstantial evidence tended to show that Deangelo did not kill Cox in self-defense:

> We may know not -- we may not know exactly what happened in unit 407, what the argument was -- was about, but we knew -- we do know that the defendant knows. The defendant knows that what he did was not self-defense. It was murder. And it was arson to cover it up.

By repeatedly using "we know" to show what could and could not be known under the unique circumstances of this case, the DPA implied that those statements using "we know" amounted to statements of uncontroverted fact, including in instances where those statements were not supported by the evidence presented.

The Hawai'i Supreme Court explained in Conroy,

> In light of the prestige associated with the prosecutor's office and the significant persuasive force the prosecutor's argument is likely to have on the jury, this court has repeatedly recognized that the prosecutor has a duty to seek justice, to exercise the highest good faith in the interest of the public and to avoid even the appearance of unfair advantage over the accused.

148 Hawai'i at 203, 468 P.3d at 217 (internal quotation marks omitted) (quoting Basham, 132 Hawai'i at 116, 319 P.3d at 1124). There, the court further noted that "use of the inclusive pronoun, 'we,' implied that the jury and the State had similar interests and were working together in convicting" the defendant. Id. at 202, 468 P.3d at 216. "This implication of unity, and the suggestion of an alliance between the State and

14

the jury against [the defendant], was improper." Id. at 202-03, 468 P.3d at 216-17.

Admittedly, the facts of Conroy differ materially from the facts of this case, and the case at bar presents a closer question. Nonetheless, although some individual uses of "we know" may appear acceptable when viewed in isolation, when viewed in the context of the entire closing argument, we are left with the firm belief that the cumulative effect of the DPA's overreliance on "we know" improperly bolstered the State's case. See id.

## C.    Misconduct Requires Vacatur and Warrants Remand

Finally, because there was misconduct, we must determine whether the misconduct was harmless beyond a reasonable doubt by looking at "the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against the defendant." Udo, 145 Hawai'i at 538, 454 P.3d at 479 (citation omitted).

While the statement that "[t]he presumption of innocence is gone" may have been harmless beyond a reasonable doubt because the circuit court immediately struck the statement, the other improper statements were not harmless. For the other improper statements, there were no curative instructions and the evidence against Deangelo was

15

circumstantial. Additionally, the use of "we know" was pervasive. Thus, we cannot say that there was no reasonable possibility that the improper statements may have contributed to Deangelo's convictions. Accordingly, Deangelo's convictions must be vacated. See State v. Williams, 149 Hawaiʻi 381, 392, 491 P.3d 592, 604 (2021).

Deangelo further argues that the improper statements were so egregious that it warrants this court barring reprosecution on remand. They do not.

The bar to reprosecution is only appropriate in the exceptional case:

> We note and emphasize that the standard adopted for purposes of determining whether double jeopardy principles bar a retrial caused by prosecutorial misconduct requires a much higher standard than that used to determine whether a defendant is entitled to a new trial as a result of prosecutorial misconduct. Double jeopardy principles will bar reprosecution that is caused by prosecutorial misconduct only where there is a highly prejudicial error affecting a defendant's right to a fair trial and will be applied only in exceptional circumstances such as the instant case. By contrast, prosecutorial misconduct will entitle the defendant to a new trial where there is a reasonable possibility that the error complained of might have contributed to the conviction" [sic] (i.e., the error was not "harmless beyond a reasonable doubt").

State v. Rogan, 91 Hawaiʻi 405, 423 n.11, 984 P.2d 1231, 1249 n.11 (1999) (first emphasis added).

This is not that case.

### III. Conclusion

Based on the foregoing, we vacate the circuit court's July 18, 2024 Judgments of Conviction and Sentence in 1CPC-22-

16

0001357 and 1CPC-23-0000307 and remand the cases for a new trial.

DATED:  Honolulu, Hawai'i, February 27, 2026.


On the briefs:                          /s/ Clyde J. Wadsworth
                                        Presiding Judge

Seth Patek,
Deputy Public Defender,                 /s/ Sonja M.P. McCullen
for Defendant-Appellant.                Associate Judge


Brian R. Vincent,                       /s/ Kimberly T. Guidry
Deputy Prosecuting Attorney,            Associate Judge
City and County of Honolulu,
for Plaintiff-Appellee.