**Electronically Filed
Supreme Court
SCWC-16-0000793
16-DEC-2019
09:11 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

_____

STATE OF HAWAI'I, Respondent/Plaintiff-Appellee,

vs.

KIMBERLY J. UDO, Petitioner/Defendant-Appellant.

_____

SCWC-16-0000793

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000793; CRIMINAL NO. 14-1-1199)

DECEMBER 16, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY McKENNA, J.

## I.    Introduction

This appeal arises from Kimberly J. Udo's ("Udo")

manslaughter conviction in violation of Hawai'i Revised Statutes

("HRS") § 707-702(1)(a) (2014),[1] for which she was sentenced to

twenty years of incarceration with credit for time served, to

_____

[1]     HRS § 707-702(1)(a) provides as follows: "(1) A person commits the offense of manslaughter if: (a) The person recklessly causes the death of another person . . . ."

run concurrently with any other term served.  Udo's appeal is based on the deputy prosecuting attorney's ("DPA") cross-examination of the defense's only witness, pathologist James Navin, M.D. ("Dr. Navin") and closing argument references to Dr. Navin's testimony.  Udo alleges the DPA's cross-examination of Dr. Navin regarding his testimony as a defense expert in two of the most well-publicized and notorious murder trials in Hawai'i within the last decade involving defendants Kirk Lankford ("Lankford") and Matthew Higa ("Higa"), and closing arguments about that testimony, amounted to prosecutorial misconduct affecting her substantial rights for which this court should take plain error notice.

In its June 29, 2018 Summary Disposition Order ("SDO"), the Intermediate Court of Appeals ("ICA") affirmed Udo's conviction, ruling that the DPA's cross-examination of Dr. Navin with respect to his testimony in the Lankford and Higa trials was not improper because it was (1) relevant to establishing Dr. Navin's defense bias; and (2) did not "rise to the level of misconduct in [State v. ]Rogan[, 91 Hawai'i 405, 984 P.2d 1231 (1999)]." See State v. Udo, CAAP-16-000793, at 5-6, 7 (App. June 30, 2018) (SDO).  The ICA also held that the DPA's references to these cases in his closing argument were within the bounds of

reasonable inference that a prosecutor may draw from the testimony.  Udo, SDO at 8-9.

In Udo's case, as argued by Udo on appeal, the DPA improperly referenced Dr. Navin's testimony in the Lankford and Higa trials, which affected Udo's substantial right to a fair trial.  Accordingly, we vacate the ICA's judgment on appeal, which had affirmed Udo's conviction and sentence, and we remand this case for further proceedings consistent with this opinion.

## II.  Background

### A.  Factual Summary[2]

On the night of July 20, 2014, Sandra Wollaston ("Wollaston") slept on the sidewalk fronting 1150 Bishop Street, along with Charles Kingston ("Kingston"), Mimi Clinton ("Clinton"), Richard Kazmierski ("Kazmierski"), and Robert Supee ("Supee").  Sometime early the next morning, on July 21, 2014, Wollaston, Kingston, Clinton, and Kazmierski awoke.

Around 4:20 a.m., Udo was walking her dog along Bishop Street and began slamming the dog against a wall.  Wollaston then called out to Udo, cursing, asking what she was doing to the dog.  Udo responded by cursing back, indicating it was none of Wollaston's business.  Udo then approached Wollaston.

---

[2]   This brief factual background is compiled from the testimony adduced at trial.

Wollaston stood up and she and Udo began fighting. At some point, they fell over Clinton. While Wollaston remained on the ground, Udo kicked Wollaston in the face and stomped on her head and neck multiple times, walking away and then returning three to four times to repeatedly strike Wollaston. Wollaston lay motionless after the final impact and Udo walked away towards Union Mall.

Kingston called 911 and Wollaston was taken by ambulance to Queen's Medical Center ("QMC"). At 4:40 a.m., while in the ambulance, Wollaston lost her pulse, her heart stopped beating on its own, and she no longer breathed spontaneously. She was declared dead at QMC at 5:42 a.m., and her body was taken to the Honolulu medical examiner for an autopsy.

Meanwhile, Honolulu Police Department ("HPD") officers apprehended Udo, and Kingston positively identified Udo in a field show-up as the woman he saw assault Wollaston. Udo was arrested and taken into custody.

B.   Circuit Court Proceedings

On July 24, 2014, a grand jury issued a bench warrant and indicted Udo for Second Degree Murder in violation of HRS §§ 707-701.5 (2014)[3] and 706-656 (2014).[4] The indictment alleged

---

[3]   HRS § 707-701.5 provides as follows:

(continued. . .)

that on July 21, 2014, Udo intentionally or knowingly killed Wollaston.[5]

### 1.   Evidentiary Portion of Jury Trial

A jury trial was held between February 22 and March 3, 2016 before the circuit court.[6]

### a.   State's Witnesses in Its Case-In-Chief

In summary, various witnesses called by the State testified as follows regarding evidence relevant to the questions on certiorari.

---

(. . . continued)

> **Murder in the second degree.**  (1) Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.
>
> (2)  Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706-656.

[4]   HRS § 706-656 provides in pertinent part as follows:

> **Terms of imprisonment for first and second degree murder and attempted first and second degree murder.**
> . . . .
> (2) Except as provided in section 706-657, pertaining to enhanced sentence for second degree murder, persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole.

[5]   The indictment stated:

> On or about July 21, 2014, in the City and County of Honolulu, State of Hawai'i, KIMBERLY J. UDO did intentionally or knowingly cause the death of Sandra Lee Wollaston thereby committing the offense of Murder in the Second Degree, in violation of Sections 707-701.5 and 706-656 of the Hawai'i Revised Statutes.

[6]   The Honorable Rom A. Trader presided.

Paramedic Kelly Kihe ("Kihe") responded to a 911 call for assistance at 1150 Bishop Street on July 21, 2014. When Kihe arrived on the scene, Wollaston was lying motionless on her back; Wollaston could not speak and her vital signs were weak. At 4:40 a.m., while in the ambulance, Wollaston lost her pulse, her heart stopped beating on its own, and she no longer breathed spontaneously. The paramedics used a defibrillator on Wollaston and also administered four doses of epinephrine in attempts to resuscitate her.

Kihe's clinical impression was that Wollaston had a closed head injury and that Wollaston was deceased upon arrival at QMC. Kihe did not have any information indicating that Wollaston was experiencing a heart attack.

Charlotte Carter, the medical examiner's investigator who investigated Wollaston's death, spoke with Wollaston's father, who stated Wollaston had a history of prior use of marijuana and methamphetamines. (The jury was instructed, however, not to consider Wollaston's father's comments for the truth of the matter asserted.)

HPD Officer Jarrett De Soto ("Officer De Soto"), approached Udo on Hotel Street after hearing a suspect description on the morning of July 21, 2014. When he told Udo she was a suspect in

an assault case, Udo stated, "[S]he hit me first so I went pound her."

Using photographic exhibits, Toy Stech ("Stech"), an evidence specialist with the City and County of Honolulu, pointed out possible injuries to Udo's upper right cheek, right hand, and right foot on July 21, 2014.

HPD Detective Peter Boyle ("Boyle") went to HPD's Central Receiving Division to process Udo.  While informing Udo that they would be gathering evidence from her, Udo uttered that "she gets beat up all the time in town and the first time she fights back she gets arrested."

According to HPD Detective Daniel Tsue ("Detective Tsue"), the lead detective in Udo's case, on the morning of July 21, 2014, Kingston appeared to understand his questioning, offered responsive answers, and was understandable.  Kazmierski, however, was not responsive to questions, and Detective Tsue did not interview Supee because Supee was asleep during the incident.  Detective Tsue confirmed there were no external surveillance cameras near the scene of the incident.

Kingston testified as the only eyewitness.  Kingston had lived in Hawai'i for twelve years and had been on and off the streets.  When on the streets, he slept by a Bible store at the

corner of Adams and Bishop Streets.  He had known Wollaston for a couple years.

At around 10:00 p.m. on the night of July 20, 2014, Kingston, Wollaston, Kazmierski, Supee, and Clinton went to sleep in front of Ninja Sushi after drinking together.  At around 2:45 a.m., Kingston, Wollaston, and Kazmierski awoke and had shots of vodka.

At around 4:20 a.m., Kingston saw a woman slamming her dog against a wall.  Kingston identified Udo as the woman he saw that morning.  According to Kingston, Wollaston was also awake and said something to Udo.  Udo then responded to Wollaston from about three feet away, cursing, then approached Wollaston, who had been sitting down.  Kingston told Wollaston, "Don't do it, [Wollaston]."  Wollaston responded, "No, Chaz, stay out of it. This is mine."  Then Wollaston "stood up and they scrapped, pulled hair, kicked, punched, whatever.  They fell over [Clinton].  And it got out of hand."  Kingston called 911, and an ambulance arrived within a few minutes.

Kingston was a couple of feet from Wollaston during the incident.  When Wollaston and Udo fell over Clinton, Wollaston's head hit the ground, and Udo kicked Wollaston in the face until Kingston pulled her away.  Udo left then returned three to four times, and each time, she kicked Wollaston in the head and neck

area, "stomp[ed]" on Wollaston, and uttered phrases such as "I'll kill you." After the final kick, Wollaston had "a death stare," was motionless, and was lifeless.

According to Kingston, during the incident, Clinton was present, Supee was passed out, and Kazmierski was at a store getting Wollaston a sandwich. Udo then left in the direction of Union Mall. Kingston tried to care for Wollaston, but she remained motionless and was not breathing or speaking. After HPD arrived, Kingston wrote a statement and identified Udo in a field show-up near Union Mall.

On cross-examination, Kingston testified he had consumed a few shots or a half-pint of vodka the night prior to trial. He stated he was not intoxicated throughout the period of July 20 to July 21, 2014, but had drunk about a pint of vodka on July 20, 2014 and less than half a pint the morning of the incident.

Kingston also testified that when Wollaston saw Udo abusing the dog, she cursed out Udo, asking what she was doing with the dog. According to Kingston, Wollaston voluntarily entered into the fight with Udo despite Kingston trying to stop her.

As its final witness,[7] the State presented Christopher Happy, M.D. ("Dr. Happy"), the chief medical examiner for the

---

[7]    Before presenting its final witness, the State also presented the following witnesses: (1) Veronica De Mello, a police evidence specialist for HPD, who photographed and diagrammed the crime scene; (2) HPD Sergeant Eric (continued. . .)

City and County of Honolulu.  The court qualified Dr. Happy as "a medical expert with a specialization in forensic pathology."

According to Dr. Happy, Wollaston was pronounced dead at 5:42 in the morning on July 21, 2014.  Dr. Happy performed Wollaston's autopsy on July 21, 2014.

Dr. Happy described the physiology of a human spine, neck, and brain.  He explained that "the brainstem regulates heart rate and respiratory rate," and injury to the brainstem can cause death.

Before and during Wollaston's autopsy, Dr. Happy noticed several injuries consistent with a kick or a punch on Wollaston's head, face, and brain: (1) two contusions on the right side of her face; (2) an abrasion and a contusion in the external left occipital region of Wollaston's head; (3) a subscalp hemorrhage in the right occipital subscalp area; (4) a

---

(. . . continued)
Fong, who responded to the scene and noted that Clinton, Kazmierski, and Kingston were all present, but Supee remained asleep; (3) HPD Corporal Arnold Sagucio, who went to the crime scene, and testified that Kazmierski was "extremely intoxicated" when he interacted with him, Supee remained asleep, and there were no surveillance cameras in the crime scene area; (4) HPD Officer Brian Goda, who placed an all-points bulletin with Udo's description, took Kingston to the field show-up, and could not say "how intoxicated [Kingston] was" the morning of July 21, 2014; (5) HPD Officer Dustin Hao, who was on duty at QMC's Emergency Room and confirmed that Wollaston's body was not tampered with between the time it was at QMC and the time it was transported in a sealed body bag to the medical examiner's office; and (6) HPD evidence specialist, Doryn Matsuda, who photographed Wollaston's body and swabbed her hands for evidence.  None of those witnesses who were cross-examined about drug paraphernalia testified to seeing any drug paraphernalia around the crime scene or in Wollaston's belongings.

two-by-one-and-one-half-inch abraded red and purple contusion with associated swelling in the occipital parietal scalp above Wollaston's left ear; (5) a subscalp hemorrhage on the left occipital region more extensive than the exterior injury; (6) a "two-inch horizontally oriented fracture extending from the posterior part of the temporal bone to about the mid portion of the left temporal bone" of Wollaston's skull; (7) four subscalp hemorrhages on the top of the head, indicating four different impacts; (8) bleeding in multiple locations between the dura and the surface of the brain -- subdural and subarachnoid hemorrhages;[8] and (9) "a very small four millimeter laceration" on Wollaston's brainstem, along with hemorrhaging. A tissue slide was made of Wollaston's brainstem.

At the completion of Dr. Happy's testimony the State rested. Udo moved for, but was denied, a judgment of acquittal.

### b. Defendant's Witness

Udo then called Dr. Navin as her only witness. Dr. Navin stated that he had testified "as an expert in anatomical,

---

[8] Dr. Happy testified that subdural hemorrhages are caused "[w]hen the brain moves relative to the dura, usually due to an acceleration and a sudden deceleration . . . those bridging veins tear and . . . they cause subdural hemorrhage. Subarachnoid hemorrhage . . . is usually caused by a direct blow to the surface of the brain with deformation of either the skull or an impact of the brain on the insides of the skull."

clinical pathology" for the State and for the defense over 100 times each.[9]

On direct examination, Dr. Navin testified he had reviewed all the reports in the case and the slides that were taken by Dr. Happy.  When he reviewed Dr. Happy's autopsy report, he noticed indications of previous heart damage.  Those indicators included the presence of boxcar nuclei, which could increase the risk of a heart attack, as well as areas of fibrosis.  Dr. Navin also testified that Wollaston's blood alcohol level was 0.278 and there was evidence of marijuana in high levels, which could increase the risk of heart attack.  Citing an article in National Geographic, he testified that marijuana use "can cause doubling of the heart rate and greatly increases the risk of heart attacks," and given Wollaston's heart condition, he opined that the potential impact of combining marijuana and alcohol consumption is death.

---

[9]    Although not raised by the defense, during the February 25, 2016 questioning of Dr. Navin, the DPA also inserted the Higa case into his voir dire questioning regarding Dr. Navin's qualifications:

> Q. Okay.  Do you remember testifying on January 26, 2010, just down the hall, in the case of State of Hawaii versus Matthew Higa?
> A. Of what?
> Q. Matthew Higa was the defendant.  Do you remember that case?
> A. Yes.

Upon his request, the medical examiner's office resliced paraffin slides of Wollaston's heart, and Dr. Navin discovered that contraction band necrosis was present in Wollaston's heart. Dr. Navin explained that contraction band necrosis was not a specific diagnosis of a heart attack and had many possible causes.

Dr. Navin testified that in forming his opinions, he also considered Wollaston's long history of alcoholism, drug abuse, which included methamphetamines and marijuana, and substandard living conditions. It was Dr. Navin's theory that Wollaston's death resulted from the mixture of alcohol, marijuana, Wollaston's pre-existing heart condition, and the physical activity of the fight. Dr. Navin testified that Wollaston could not speak when police arrived because a myocardial infarction can have a similar effect on the vocal chords as a brainstem injury.

Dr. Navin opined that Dr. Happy failed to examine sections of the brain and that Wollaston's brain was not actually swollen. According to Dr. Navin, however, Wollaston's heart was abnormally enlarged by fifty percent. Dr. Navin testified that the autopsy report did not note "contraction band necrosis and other cellular changes indicative of myocardial infarction present in both the original slides and the recuts."

Dr. Navin testified that the presence of wavy fibers, although a non-specific finding, in conjunction with the contraction band necrosis found in a whole area of Wollaston's heart just "four hours old" supported his conclusion.  Dr. Navin also opined that the contraction band necrosis was more likely from a heart attack than from epinephrine or the external cardiac massage because the bands were not isolated, and Wollaston had granules throughout her heart and edema caused by cellular injury that could have appeared hours prior to the fight.  Dr. Navin also explained that if Wollaston only exhibited the granules and contraction band necrosis, it would be consistent with external massage.  The edema and holes indicating cellular injury could have occurred prior to the fight and were independent of any blunt trauma.

As to Wollaston's head injuries, Dr. Navin testified the abrasion on the back of Wollaston's head was more likely caused by hitting her head when she fell, but could have been from a kick.  Dr. Navin did not believe Wollaston's head injuries were fatal because they consisted of "just a bruise" in the scalp and "surface hemorrhages" on the brain.  According to Dr. Navin, the injury to the brainstem could have contributed to her death, but that was unclear to him because he did not have cut sections of the brain to review.  The tear in the brainstem could have been

14

the primary cause of death instead of the heart attack, he acknowledged, or "it could add more stress to an already existing stressful situation."

According to Dr. Navin, without a heart attack, it was entirely possible that Wollaston would have survived the left temporal bone fracture. As to Wollaston's vertebral artery injury in the neck, he stated it was not typically a fatal injury but could be depending on the circumstances, and he shared a story of a woman who died from such an injury. In his opinion, Wollaston's injuries to her medulla were survivable.

On cross-examination, Dr. Navin agreed his experience in cytopathology, pap smears, and rabies did not relate to myocardial infarction or the kinds of injuries sustained by Wollaston during the July 21, 2014 incident. Regarding his experience as an expert witness, Dr. Navin stated he had previously testified for the public defender's office on death cases but also for the Honolulu prosecutor's office, primarily in sexual assault cases. He could not remember if he had testified for the prosecutor's office within the past five years.

The DPA then questioned Dr. Navin regarding his testimony in two murder cases on behalf of the defense: the Lankford trial in 2008 and the Higa trial in 2010. In response to the DPA's

questions, Dr. Navin testified the Lankford trial involved a missing Japanese student, Masumi Watanabe, whose disappearance resulted in a large-scale police investigation.  Dr. Navin testified he could not recall his fee schedule in the Lankford case.

The DPA then began questioning Dr. Navin about a hypothetical question asked by Lankford's defense counsel during that trial:

> Q. Do you recall [defense counsel] posing a
> hypothetical to you: A vehicle travelling 40 miles an
> hour with a woman, five feet two inches tall, 100 pounds,
> seated in the right front passenger seat.  Thereafter the
> woman opens the door, falls out of the right front
> passenger seat and strikes her head against a rock that's
> on the ground.  Do you remember that hypothetical being put
> to you?
> A. Yes.
> Q. And then you testified, based on that hypothetical, that
> the woman based on your training and experience would be
> dead under those circumstances, right?
> A. She could be, yes.
> Q. She could be.  But in your testimony on that day, you
> would agree that you speculated about what could have
> happened based on that hypothetical, right?
> A. I don't remember.

To refresh Dr. Navin's memory, the State turned Dr. Navin's attention to a binder including the transcript of his testimony in the Lankford trial and asked him to read a number of lines.[10]

---

[10]  The State asked, "would reviewing your testimony of March 20th, 2008 refresh your recollection as to what you testified to in another case?" Udo's counsel promptly objected and requested to approach the bench.  Udo's counsel argued the State was offering a different case to refresh Dr. Navin's recollection, and requested the court to compel the State to provide Dr. Navin with the document related to the hypothetical to refresh his recollection.  The court declined the request because no rule of evidence applied to compel the document to be provided.  Udo's counsel insisted the (continued. . .)

The following line of inquiry between the DPA and Dr. Navin then transpired. We refer to the underlined passage that Udo raises on appeal as the "Lankford Question":

> Q. [DPA] Okay. So you recall the defense attorney giving you a hypothetical example of a woman, five feet two inches tall, a hundred pounds, falling out of the front seat--
> A. [DR. NAVIN] Jumping out.
> Q. Jump -- jump, that's right, jumping out of the front seat of the car and striking her head against a rock?
> A. Yes.
> Q. Okay. And you testified that based under those circumstances, that hypothetical, the woman would be dead?
> A. She could be.
> Q. She could be. But isn't it true that Mr. Wilkerson[, the defense attorney in Lankford,] asked you to speculate about what could have caused her death?
> [Udo's counsel]: Objection, your honor. Lack of foundation.
> The Court: All right. Well, overruled at this time.
> Q. [DPA] In fact, turn to pages 75, doctor. Lines 4 and 5, the defense attorney asked you, "Could you tell us the things that could have happened?" That was the question that was put to you, right?
> A. Yes.
> Q. And then your response, you said, "She could have torn blood vessels. She could have torn the brainstem." So you were speculating as to what could have happened based on a hypothetical given to you by the defense attorney, right?
> A. Well, there are a whole list of possibilities, but yeah.
> Q. Well, based on your training and experience, you know that an injury to the brainstem can cause death?
> A. It can, yes.
> Q. And that's what you testified to in the Lankford case on March 20th, 2008, that damage to the brainstem can cause death?
> A. Yes, depending on the severity.
> Q. Isn't it true, Dr. Navin, that with regards to the hypothetical that was given to you in the Lankford murder case, the facts of the hypothetical came directly from the defendant? He told you his version of the events?
> A. Yes.
> . . . .
> Q. So to be clear, on March 20th, 2008, in that murder trial you testified to a hypothetical based on information provided to you by the accused, right?
> A. Yes, he told me what --

(. . . continued)
court was biased in its decision-making, to which the court responded it was not making "any decisions based upon any sort of bias for or against anyone."

Q. He believed happened?
A. What he said happened.
Q. And you would agree that based on all of the information that you reviewed in the Lankford case there was no independent corroboration of defendant Lankford's version of the events?
A. That's correct.
Q. Okay.
A. Now what he said actually was that she jumped out of the car. She didn't speak English and he didn't speak Japanese, and she was frightened and she jumped and hit her head and when he got -- he stopped the truck, got out, that she had no pulse, no respirations.
Q. And that's what she -- that's what he told you?
A. Yes.
Q. And you took it at face value, right?
A. He's the only witness.
Q. So in this case, in that case, sorry, the Lankford case, you took the word of the murder -- the accused murderer without any independent corroboration to support his version of events; that's what you did, right?
A. There wasn't anybody left.

As to Higa trial, the following line of inquiry occurred; the underlined portions that Udo raises on appeal are referred to as the "Higa Questions":

Q. Now do you remember on January 26, 2010 testifying in the case of State of Hawaii versus Matthew Higa? It's case number 08-1-0132. It's that other murder case.
A. The kid off the bridge?
Q. The kid off the bridge. Do you remember that?
A. Yes.
Q. There was an allegation that Matthew Higa threw an infant off of the bridge?
A. Yes.
Q. And this was on the H-1 overpass, right?
A. Yes.
Q. And you were retained by the defense in that case?
A. Yes.
Q. Right? And that defense attorney was Randy Oyama; do you remember him?
A. Yes.
Q. And what was your retention schedule in that case, how much were you paid?
A. Oh, I don't know.
Q. All right. But you recall Mr. Oyama calling you and agreeing to take the case?
A. Yes.
Q. Isn't it true that in the Matthew Higa case you testified as an expert witness that the infant was either

18

unconscious or dead before it struck the H-1 freeway? You testified --

A. I didn't say that.

Q. You didn't?

A. No.

Q. Turn to page -- turn to Exhibit 86.

A. Oh, oh. Wait, wait. No. Yes, I did say that. I'm sorry.

Q. Okay.

A. It was the opposite part that I -- oh, no. Right, I did.

Q. Okay. Let's take our time. I don't want to --

A. Yeah. No, no.

Q. I want to make sure we understand each other.

A. There were two aspects to it. One of them is that they asked if she -- if the kid was dead and I said probably. And the reason the kid was probably dead is when -- when he threw the body, number one, he carried the body underneath his coat down to the bridge and two people saw him walk by and they didn't see the kid. Okay? Then he gets down to the bridge and he throws the kid off and from all the -- what the witnesses saw, the kid's arms, they never moved, nothing ever moved and there was no yelling or screaming. So I said, well, there's good chance he was already unconscious or dead -- when the body was going through the air.

Q. So the purpose of your testimony, as you think back, was to say that the defendant, Matthew Higa, couldn't be guilty of murder because the baby he threw off the overpass was already dead when it hit the pavement; that was the purpose of your testimony, wasn't it?

A. No, it wasn't. The purpose of the testimony was establishing what I thought the condition of the child was, if he was killed before by Matthew Higa or somebody else and that -- that would explain it. If he was not, then --

Q. You recall that the injuries obviously to the infant were devastating?

A. The what?

Q. The injuries to the infant were devastating, remember?

A. The brain's out in the middle of the highway.

Q. That's right. And you testified as an expert that you couldn't determine whether the intracranial injuries you saw to the infant were caused before it was thrown off the highway overpass or when it hit the ground, that's what you testified to?

A. That's correct.

Q. You also testified as an expert witness in that case that you couldn't rule out if the infant's skull was fractured before it was thrown off the overpass or when it impacted the freeway, you testified to that, right?

A. Correct.

Q. But wasn't the purpose of your testimony to present evidence in that case that Matthew Higa wasn't guilty of murder because the infant could have been already dead before he threw it off the overpass?

19

A. No.  Because he could have killed him before.

With respect to the instant case, Dr. Navin testified he had not determined his fee schedule yet, but had received one advance check of $5,000 and was to receive a negotiated amount after testifying.

Regarding the materials he consulted prior to testifying, Dr. Navin testified he had consulted Wikipedia.  He also acknowledged that none of Wollaston's charts contained proof of methamphetamine in Wollaston's body, and that the source of that information came from Wollaston's father's statement, as recorded by the medical examiner's office, which Dr. Navin had not corroborated.  When the prosecution likened Dr. Navin's failure to confirm the information to his testimony in Lankford, defense counsel objected for mischaracterization of the evidence.  Before the bench, the State contended that the "offer of proof demonstrates that [Dr. Navin's] methodology is to accept at face value those assertions that seem to support his theories and conclusions without verifying the underlying. That's exactly the point that's being made . . . . That's what he did in Lankford.  That's what he's doing here."  The court overruled the objection.

Dr. Navin also acknowledged on cross-examination that he made changes to his expert report up until the morning of his

trial testimony, and previously made changes to the report after speaking with defense counsel about the report.  He also acknowledged that he referenced an article in National Geographic, which is not a scientific or peer-reviewed journal.  Additionally, he acknowledged that Wollaston's blood contained an inactive form of tetrahydrocannabinol ("THC") from marijuana, which does not have pharmacological effects.  Further, when the State clarified that Dr. Navin did not consider statements made by Kingston in forming his opinion because Kingston did not state that Wollaston was only blocking punches after she fell, defense counsel objected, but was overruled.

Dr. Navin also acknowledged that acute subdural hemorrhages are life-threatening, Wollaston's injuries could have been caused by a direct impact such as a stomp, and the subdural hemorrhaging was not a direct result of myocardial infarction.  Regarding Wollaston's brainstem, Dr. Navin testified that he did not see the slides of Wollaston's brainstem "until after [his] report went out."  Dr. Navin agreed that a tear to the brainstem could impact someone's ability to speak, but was not necessarily the reason that Wollaston could not speak the morning of July 21, 2014.  As to the vertebral artery injury, blunt force trauma to the back of the neck or side of the neck could have caused such an injury.

Dr. Navin agreed that nothing in the record from Kingston's statements or other witnesses indicated that Wollaston experienced any of the tell-tale signs of a heart attack, such as dizziness, chest pains, or shortness of breath, on the morning of July 21, 2014.  He also admitted that there was no evidence that Wollaston had hardening of the arteries, which could cause a heart attack.

Further, Dr. Navin acknowledged that epinephrine, which Wollaston received, can cause contraction band necrosis, and that he did not know the dosage of epinephrine that was administered to Wollaston.  He opined, however, that the defibrillation and epinephrine that Wollaston received was less likely than the myocardial infarction to have caused Wollaston's contraction band necrosis, "because one part of the heart has it, the other part doesn't."

On re-direct, Dr. Navin testified that it was possible that Wollaston would have survived the head injury if she had not had a heart attack.  He further testified he did not receive any instructions from defense counsel when he was retained other than to look at the case and share his opinion.

c.    **State's Rebuttal Testimony from Dr. Happy**

On rebuttal direct examination, Dr. Happy testified that the weight of Wollaston's heart was forty-two percent above

normal, not fifty percent above normal as testified by Dr. Navin.  Also, according to Dr. Happy, Wollaston's heart did not exhibit heart disease from alcoholism.  Dr. Happy determined this by making a new tissue slide from the slice of Wollaston's heart that was retained in a stock jar.  Dr. Happy also testified that Wollaston had hypertension, which can make the heart get bigger and thicker.  Wollaston did not have atherosclerosis, however, which is the underlying cause of most heart attacks.

Regarding the impacts of marijuana on the heart, according to Dr. Happy, studies indicated the connection between marijuana use and sudden cardiac death was rare and usually associated with atherosclerosis.  Further, the amount of an inactive form of THC in Wollaston's blood, as reflected by the toxicology report, was very low, and "to think that this inactive metabolite would have caused her to have a heart attack" was "erroneous."

Regarding Wollaston's heart, Dr. Happy acknowledged that he had not previously noticed the contraction band necrosis or wavy fibers.  He explained epinephrine can cause contraction bands, and opined that Wollaston "had four sources of possibilities for her contraction bands."  He explained:

> She had a fight where her epinephrine was released from her adrenal gland.  She had an intracranial hemorrhage which resulted in more epinephrine.  And then she was given six

> different shots of epinephrine, four . . . by the ambulance workers, and two by the emergency room doctors, and then she was defibrillated.  And so sure enough Dr. Navin saw these contraction bands . . . .

In Dr. Happy's medical opinion, the contraction bands Dr. Navin observed were not attributed to myocardial infarction, and the timeline Dr. Navin presented for a myocardial infarction was correct for a person that is atherosclerotic, but Wollaston was not atherosclerotic.  As to the wavy fibers, according to Dr. Happy, they could arise with increased epinephrine and had been seen in cases of fatal cranial trauma as well as with heart attacks.

Dr. Happy then described the symptoms of a heart attack and what happens to the heart during a myocardial infarction. According to him, in particular, a heart attack causes extreme pain, and if Wollaston did have a fatal heart attack four hours prior to the fight, as Dr. Navin stated, "a significant amount of her heart muscle would have had to die."  According to Dr. Happy, the tissue slides did not reflect that had happened.

Dr. Happy had prepared a report on Wollaston's autopsy. During the autopsy he examined both Wollaston's heart and brain. He testified that, contrary to Dr. Navin's testimony, he did examine the cerebrum internally and documented it in the report, and a sample of Wollaston's brainstem was placed in a tissue block and a slide was made of it.  He testified that the heart

24

and brainstem tissues that Dr. Happy used to form his opinion were available to Dr. Navin for inspection.

Dr. Happy opined that, to a reasonable degree of medical probability, Wollaston's death was caused by "[b]lunt force head and neck injury." The "mechanism of death" "was subarachnoid hemorrhage . . . around the brainstem."

On rebuttal cross-examination, he acknowledged he did not take tissue slides of the cerebrum, besides the brainstem, to examine the brain at the cellular level.

On re-direct examination, Dr. Happy testified he had seen the note in the investigator's report that Wollaston had a history of methamphetamine use, which was based upon the statement by Wollaston's father, but did not find any evidence in her medical record of such use.

On re-cross-examination, Dr. Happy stated that he received information about how Wollaston sustained her injuries from a detective attending the autopsy on the morning of July 21, 2014.

### 2. Closing Arguments

During the State's closing argument, the DPA reminded the jurors they had the discretion to weigh the credibility of the experts, and should look to the experts' methodologies to make that determination. The DPA detailed Dr. Happy's credentials and noted that Dr. Happy's testimony was consistent with both

the medical literature and Kingston's testimony of the events on July 21, 2014.

The DPA then attacked Dr. Navin's methodology as outdated, highlighting that he did not have any experience "conducting forensic brain consultations."  The DPA then raised the issue of Dr. Navin's self-interest as a paid defense witness, recalling his testimony in other cases.  For the purposes of this opinion, we refer to the first underlined remark as the "Lankford Closing Remark" and the second underlined remark as the "Higa Closing Remark":

> And now I will explain why Dr. Navin's methodology, opinion, and analysis are not based on sound reasons, rest on faulty judgment, and are anchored on patently false information.
> . . . .
> Consider his testimony in other murder cases.  In the case of State of Hawaii versus Kirk Matthew Lankford, the case of the missing Japanese student, he testified just across the hall.  He gave an expert opinion as to the missing student's cause of death based on a scenario given to him by the defendant.  And in fact he admitted on cross-examination that there was no independent corroboration for that version of events.
> And so he testified to a reasonable degree of medical certainty in another murder case that the missing student, Masumi Watanabe, essentially killed herself when she jumped out of a moving car that was traveling 30 to 40 miles per hour, struck her head on a rock, damaged her brainstem, and died.  That was his testimony in another murder trial just across the hall.  That is a clear cut example of his defense bias.  You see, if Dr. Navin does not give an opinion that's favorable to his paying client, his phone stops ringing.  That's the way it works.
> . . . .
> But it doesn't stop there.  Consider his testimony in the case of State of Hawaii versus Matthew Higa where an infant was launched off the H-1 overpass and was essentially smashed on the freeway.  He testified for the defense to a reasonable degree of medical certainty that he couldn't tell whether the baby was dead or alive before it smashed onto the freeway.  The purpose of his testimony in

> that case was to provide a defense for the accused murderer that a murder couldn't have happened based on throwing a baby off of an overpass because the baby could have been dead already. That is the kind of testimony that Dr. Navin has given in other murder trials. That's the kind of credibility that he has held himself up to, a paid defense witness whose opinion is for sale. That's the way it is.

Udo did not object during this portion of the DPA's closing argument referencing the Lankford and Higa trials.

The DPA then explained why Dr. Happy's contraction band necrosis analysis was the most plausible.

In Udo's closing argument, Udo described the case as between two experts, arguing that (1) the attacks on Dr. Navin's reputation and credibility were not warranted; (2) Dr. Happy was self-interested; and (3) Kingston's testimony was not credible. This was a mutual affray, Udo emphasized, and Udo never intended for Wollaston to die.

On rebuttal, the State reiterated that Dr. Navin's testimony was "for sale" in Lankford and Higa, as well as "when he testifies for the defense here." The State concluded by arguing the credible evidence demonstrated beyond a reasonable doubt that Wollaston's death was due to a blunt force trauma to the head and neck, not a heart attack.

### 3.   Verdict and Sentence

The jury returned a verdict finding Udo "guilty of the included offense of Manslaughter[,] Recklessly Causing Death" in violation of HRS § 707-702(1)(a).[11]

A further jury hearing was held on the State's request for an extended term sentence.  The jury could not reach a unanimous decision and the court declared a mistrial.  On September 13, 2016, the circuit court then sentenced Udo to twenty years of incarceration with credit for time served, to run concurrently with any other term served.[12]  After the court announced Udo's sentence, defense counsel made, and was granted, a motion to withdraw and for appointment of appellate counsel.  Udo appealed to the ICA through substitute counsel.

### C.   ICA Proceedings

#### 1.   Opening Brief

On appeal, Udo asserted "multiple acts of misconduct" by the DPA.[13]  Udo contended that prosecutorial misconduct may

---

[11]   Udo filed, but was denied, a motion for new trial.  The circuit court's denial of her motion for new trial was not raised on appeal to the ICA or to this court.

[12]   The circuit court also required Udo to pay $10,000 restitution to the Crime Victim Compensation Commission, a $105 Crime Victim Compensation Fee, and $100 Internet Crimes Against Children Fee.

[13]   Udo also alleged on appeal that the failure of trial counsel to object to prosecutorial misconduct constituted ineffective assistance of counsel. The ICA ruled against Udo.  Based on our ruling vacating the conviction based on prosecutorial misconduct, we need not and do not further address the ineffective assistance allegation.

provide grounds for a new trial if there is a reasonable possibility that the misconduct complained of might have contributed to the conviction, and was necessary in her case based on the Lankford and Higa questions and closing remarks, citing State v. Balisbisana, 83 Hawaiʻi 109, 114, 924 P.2d 1215, 1220 (1996).

Udo contended the Lankford Question and Higa Questions were irrelevant and prejudicial, and should have been excluded under the Hawaiʻi Rules of Evidence ("HRE") Rules 401 (1980), 402 (1980), and 403 (1980), because they did not elicit any admissible evidence that was relevant to Dr. Navin's truthfulness, expert qualifications, or methodology.  Udo argued the Lankford Question misled the jury by suggesting Dr. Navin should have corroborated the facts of the hypothetical in that case but did not.  The Higa Questions, Udo contended, also misled the jury.  Udo also argued that in the DPA's closing argument, the Lankford Closing Remark and Higa Closing Remark also misled the jury and "unfairly exposed Dr. Navin to the scorn of the jury."[14]

---

[14]    Udo alleged two additional instances of prosecutorial misconduct that are not raised in Udo's application to this court: (1) "In his rebuttal argument, the DPA expressed his personal opinion that Dr. Navin was not credible;" and (2) "In his closing argument, the DPA attacked Dr. Navin's integrity by making disparaging remarks about him."  As to the second, Udo challenged the State's following statements: Dr. Navin "is on the speed dial for the criminal defense bar here in Honolulu;" "if Dr. Navin does not give
(continued. . .)

The Lankford Closing Remark, Udo asserted, improperly indicated that Dr. Navin was supposed to corroborate the facts underlying the hypothetical posed to him in that case, and the Higa Closing Remark misled the jury about Dr. Navin's purpose for testifying in that case.

The DPA's misconduct, Udo argued, was not harmless because it undermined the credibility of Dr. Navin, Udo's sole witness, whose testimony was essential to establish that Udo's conduct was not the direct cause of Wollaston's death.  The alleged misconduct, Udo argued, "aroused jury resentment and hostility toward [Dr. Navin]."  The instances of misconduct were not cured, Udo asserted, "because defense counsel did not object to any of them," and the misconduct warranted appellate review and a determination of mistrial because the DPA's conduct deprived Udo of her right to a fair trial.

---

(. . . continued)
an opinion that's favorable to his paying client, his phone stops ringing. That's the way it works."; Dr. Navin is "a paid defense witness whose opinion is for sale.  That's the way it is."; and "When Dr. Navin stops presenting expert testimony favorable to the defense in criminal cases, his phone stops ringing.  Clearly he wants his phone to ring."
    Although the DPA was free to cross-examine Dr. Navin on his alleged defense bias and argue the same during closing, we note that these comments may have gone beyond the reasonable inferences to be drawn from the record.
    Udo also cited under this point of error portions of the DPA's closing argument which stated that Dr. Navin "made up" the information that Wollaston was "unresponsive" and "just blocking punches" after she fell because that information was not included in Kingston's testimony and Dr. Navin could not say at trial where in the record that information was provided.  That issue is not raised in Udo's application to this court.

## 2.    Answering Brief

The State responded that Udo waived any arguments related to the Lankford Question and Higa Questions because Udo did not object to those questions at trial.  Without conceding that arguments related to those cases were not waived, the State addressed the merits of Udo's claims of prosecutorial misconduct.

First, the State argued that under HRE Rule 609.1 (1980), "[b]ias, interest, or motive is always relevant" and "can be raised at any time by the witness's testimony or other evidence," quoting State v. Estrada, 69 Haw. 204, 220, 738 P.2d 812, 823 (1987).  The State maintained that it was not improper for the DPA to use the Lankford and Higa cases "to demonstrate Dr. Navin's bias in cases involving the death of another person," especially given that Dr. Navin had only ever testified for the defense in cases involving death of another person.  The State asserted that Dr. Navin's testimony in those cases was clearly helpful to the defense, and was relevant and probative to a determination of Dr. Navin's credibility in the present case.

Lankford was relevant, the State argued, because in that case, Dr. Navin testified based upon a hypothetical that the decedent could have died from a brainstem injury.  In contrast,

31

the State maintained, in the instant case Dr. Navin testified that Wollaston's brainstem injury "could have contributed" to Wollaston's death, but indicated he did not have enough information to make that determination.  Both cases, the State argued, involved a head injury, but Dr. Navin was willing to venture an opinion in the Lankford trial without any corroborated facts and was unwilling to do so in the instant case, indicating a defense bias.

Similarly, the State argued, Dr. Navin testified that in the Higa trial his purpose was to offer testimony on whether the infant could have been killed prior to being thrown off the overpass.  The State maintained that in the instant case, Dr. Navin testified that Wollaston died of a heart attack and her intracranial injuries were "all secondary."  Thus, the State argued, in both Higa and the instant case, Dr. Navin testified to a theory of death that preceded the cause of death advanced by the prosecution, thereby favoring the defense and making his testimony in Higa relevant and more probative of Dr. Navin's credibility than prejudicial to Udo's defense.  Additionally, the State asserted, Dr. Navin himself characterized Higa as "the

kid off the bridge" case and it was not improper for the DPA to describe the circumstances of the case for context.[15]

Moreover, the State argued, the DPA's closing argument statements related to the Lankford and Higa trials were not improper and did not resort to falsehood and misrepresentation.[16] The State asserted that the DPA drew reasonable inferences from Dr. Navin's testimony regarding his testimony in the Lankford trial that Dr. Navin exhibited a defense bias by relying on the defendant's version of the events to state that the decedent's death could have been caused by a torn brainstem. The State also asserted it was reasonable to infer from Dr. Navin's testimony that his purpose in the Higa trial was to "provide a defense for the accused murderer that a murder couldn't have happened based on throwing a baby off the overpass because the baby could have been dead already." Neither comment, the State

---

[15] The State also countered Udo's assertion that the DPA improperly expressed his personal opinion during rebuttal when he said, "Dr. Navin's testimony is for sale" and "[t]hat's the unassailable truth." That issue is not raised in Udo's application to this court.

[16] The State also argued the same in relation to Udo's contention that the DPA made misleading comments related to Dr. Navin "admitting" being retained by another defense attorney for the defense but not testifying because his testimony would not have been helpful to the defense in a case. The State acknowledges that the DPA "overstated the evidence" based on Dr. Navin's testimony, but that the comment did not rise to the level of plain error and was made within the context of an "otherwise appropriate argument." The ICA held that the comment was improper, but harmless. Udo, SDO at 15. That issue is not raised in Udo's application to this court, but we agree with the ICA that the comment was improper.

argued, was improper, and did not constitute falsehood and misrepresentation.[17]

The State contended that even if any of the DPA's conduct was improper, the conduct did not rise to the level of plain error. The State summarized the evidence presented at trial, and asserted that any error would be harmless beyond a reasonable doubt because the evidence establishing Wollaston died due to blunt force injuries was overwhelmingly stronger than the evidence supporting Dr. Navin's opinion regarding the cause of death.[18]

### 3. ICA's SDO

In an SDO, the ICA affirmed Udo's conviction and sentence. Udo, SDO at 1.

The ICA held that the DPA's cross-examination of Dr. Navin regarding his testimonies in the Lankford and Higa trials was not improper. Udo, SDO at 5. Under HRE Rule 609.1, the ICA opined that bias, interest, or motive is always relevant and an expert witness's testimony in other cases may be used to

---

[17]    The State also contended the DPA's alleged "disparaging remarks" about Dr. Navin in his closing argument were not improper, were reasonably drawn inferences from the evidence presented, and, "when viewed in context," "were hyperbole, colloquialisms, or figures of speech reflecting the DPA's interpretation of the evidence to emphasize Dr. Navin's bias . . . ."

[18]    Pursuant to Hawai'i Rules of Appellate Procedure Rule 28(d) (2016), Udo did not file a reply brief.

demonstrate the expert's defense bias. Udo, SDO at 4 (citations omitted).

According to the ICA, Dr. Navin's testimony was admissible and he had the opportunity to explain or deny the State's allegations with respect to his prior testimony. Udo, SDO at 5. Although the ICA agreed that the DPA's characterization of Lankford and Higa was unnecessarily provocative, it opined the inquiry was generally pertinent to Udo's case and "did not rise to the level of misconduct in Rogan . . . ." Udo, SDO at 5. The ICA thus held that the DPA's cross-examination of Dr. Navin about his testimony in the Lankford and Higa cases did not constitute prosecutorial misconduct. Udo, SDO at 5.

As to the Lankford Closing Remark, the ICA stated the reference to the lack of independent corroboration was potentially inflammatory, but held it was not improper because the defense had the opportunity but failed to object or remind the jury that the Lankford testimony was based upon a hypothetical. Udo, SDO at 8.

Regarding the Higa Closing Remark, the ICA opined the remarks tended to unnecessarily highlight the odious nature of the facts in the Higa case, but were not inconsistent with Dr. Navin's testimony and were pertinent to Dr. Navin's credibility.

Udo, SDO at 8. Thus, the ICA held, the remark did not constitute prosecutorial misconduct. Udo, SDO at 8.

### III. Standard of Review

As we stated in State v. Wakisaka,

> If defense counsel does not object at trial to prosecutorial misconduct, this court may nevertheless recognize such misconduct if plainly erroneous. "We may recognize plain error when the error committed affects substantial rights of the defendant." State v. Cordeiro, 99 Hawai'i 390, 405, 56 P.3d 692, 707 (2002) (citations and internal quotation marks omitted). See also Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (2003) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). We will not overturn a defendant's conviction on the basis of plainly erroneous prosecutorial misconduct, however, unless "there is a reasonable possibility that the misconduct complained of might have contributed to the conviction." State v. Rogan, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999). As we stated in State v. Sawyer:
>
>> Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of "whether there is a reasonable possibility that the error complained of might have contributed to the conviction." Factors considered are: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant.
>
> 88 Hawai'i 325, 329 n.6, 966 P.2d 637, 641 n.6 (1998) (quoting State v. Balisbisana, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996)) (citations omitted).

102 Hawai'i 504, 513, 78 P.3d 317, 326 (2003).

### IV. Discussion

A. **Overview of Prosecutorial Misconduct Analysis**

On certiorari, Udo contends the ICA erred in rejecting her claim that the DPA engaged in four instances of prosecutorial

misconduct, which deprived her of her right to a fair trial: the Lankford Question, the Lankford Closing Remark, the Higa Questions, and the Higa Closing Remark (collectively the "Lankford and Higa References").  Udo did not object to the Lankford and Higa References at trial, but requests that this court recognize plain error and vacate her conviction and remand her case for a new trial.

The term "prosecutorial misconduct" is a legal term of art that refers to any improper action committed by a prosecutor, however harmless or unintentional.  State v. Maluia, 107 Hawaiʻi 20, 25, 108 P.3d 974, 979 (2005).  "If defense counsel does not object at trial to prosecutorial misconduct, this court may nevertheless recognize such misconduct if plainly erroneous," meaning that the error affected a defendant's substantial rights.  Wakisaka, 102 Hawaiʻi at 513, 78 P.3d at 326.  See also HRPP Rule 52(b) (2003) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").  A defendant's substantial rights include the right to a fair trial.  State v. Fields, 115 Hawaiʻi 503, 538, 168 P.3d 955, 990 (2007).  Thus, prosecutorial misconduct provides grounds for a new trial if a prosecutor's actions denied the defendant a fair trial.  State v. Pasene, 144 Hawaiʻi 339, 364, 439 P.3d 864, 889 (2019).

Whenever a defendant alleges prosecutorial misconduct, this court must first decide: (1) whether the conduct was improper; (2) if the conduct was improper, whether the misconduct was harmless beyond a reasonable doubt; and (3) if the misconduct was not harmless, whether the misconduct was so egregious as to bar reprosecution.  Maluia, 107 Hawai'i at 25-26, 108 P.3d at 979-80.  To address the second factor, whether alleged misconduct is harmless beyond a reasonable doubt, this court considers three prongs, "the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against the defendant." State v. Iuli, 101 Hawai'i 196, 208, 65 P.3d 143, 155 (2003) (citations omitted).  Prosecutorial misconduct is not harmless beyond a reasonable doubt if "there is a reasonable possibility that the misconduct complained of might have contributed to the conviction."  Wakisaka, 102 Hawai'i at 513, 78 P.3d at 326.

If the conduct was improper and not harmless beyond a reasonable doubt, then the prosecutor's actions denied the defendant a fair trial, providing grounds for a new trial.  We must then also address the third factor of the prosecutorial misconduct analysis: whether the misconduct was so egregious as to bar reprosecution.

## B. Whether the Conduct Was Improper

The first factor of the prosecutorial misconduct analysis is determining whether the DPA's conduct was improper. In evaluating whether a prosecutor's conduct was proper, "this court considers the nature of the challenged conduct in relation to our criminal justice system generally and the special role of the prosecutor specifically." State v. Underwood, 142 Hawai'i 317, 325, 418 P.3d 658, 666 (2018) (citing Rogan, 91 Hawai'i at 412-15, 984 P.2d at 1238-41).

Udo asserts the Lankford Question (the DPA's cross-examination as to whether Dr. Navin "took the word of the accused murderer without any independent corroboration to support his version of events" when Dr. Navin testified based on a hypothetical that someone in the decedent's circumstances could have died of a brainstem injury) constituted prosecutorial misconduct because the questioning was inflammatory, irrelevant, and prejudicial. The State argues the Lankford Question was a permissible attack on Dr. Navin's credibility to establish bias by demonstrating that Dr. Navin would "tailor" his opinion to assist the defense, even without evidence.

As to the Higa Questions (the DPA's questioning implying that Dr. Navin's purpose in testifying in the Higa trial was to say that the defendant "couldn't be guilty of murder"), Udo

39

argues Dr. Navin did not expressly or implicitly indicate his purpose was to provide a defense for Matthew Higa.  Udo argues the Higa Questions were irrelevant and prejudicial and were only meant to inflame the jury and create hostility towards Dr. Navin.  The State, in response, asserts that the Higa Questions were relevant and probative of Dr. Navin's defense bias and as evidence that Dr. Navin is a "hired gun" for the defense because, similar to Udo's case, his testimony in Higa also provided a causation defense for the defendant.

HRE Rule 702.1(a) (1984) provides that an expert witness "may be cross-examined to the same extent as any other witness" and, additionally, "may be cross-examined as to (1) the witness' qualifications, (2) the subject to which the witness' expert testimony relates, and (3) the matter upon which the witness' opinion is based and the reasons for the witness' opinion." Pursuant to HRE Rule 609.1, "[t]he credibility of a witness may be attacked by evidence of bias," and extrinsic evidence of bias is admissible on cross-examination if "the matter is brought to the attention of the witness and the witness is afforded an opportunity to explain or deny the matter."  We have noted, "[b]ias, interest, or motive is always relevant under HRE Rule 609.1.  So long as a proper foundation is laid, bias can be raised at any time by the witness's testimony or other

evidence." Estrada, 69 Haw. at 220, 738 P.2d at 823 (citing State v. Murphy, 59 Haw. 1, 575 P.2d 448 (1978)).

A prosecutor's latitude in cross-examination, however, remains limited by HRE Rule 403's requirement that the probative value of evidence substantially outweigh the danger of unfair prejudicial effect of the evidence.[19] More importantly, the prosecutor has a duty to seek justice, not merely convict, and to not use arguments calculated to inflame the passions of a jury. Rogan, 91 Hawai'i at 412-13, 984 P.2d at 1238-39 (prosecutor has "duty to seek justice, to exercise the highest good faith in the interest of the public" and "not use arguments calculated to inflame the passions . . . of the jury.") (citations omitted).

The Lankford Question and Higa Questions had limited probative value as evidence of Dr. Navin's alleged defense bias. The Lankford Question evidenced that Dr. Navin based his opinion in the Lankford trial on "facts or data . . . perceived by or made known to [him] at or before the hearing," which is a permissible manner of forming the bases of an expert opinion

---

[19]    HRE Rule 403 states as follows: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

under HRE Rule 703 (1984).[20] With respect to the Higa Questions, Dr. Navin's testimony in the Higa trial only went to the manner and time of death advanced by the prosecution; it was not testimony of whether the defendant in that case had actually killed the infant. Even if Dr. Navin's opinion formed the basis of a causation defense, the fact that he did so provides little support for the State's assertion that Dr. Navin is a "hired gun." In fact, Dr. Navin testified that he had testified for the State and for the defense over a hundred times each.[21]

The DPA's questions were, however, highly and unfairly prejudicial. The Lankford Question insinuated that it was improper for Dr. Navin to have rendered an opinion based on hypothetical facts provided to him when such questioning is explicitly allowed by HRE Rule 703. The Lankford Question also implied that it was improper for an expert to believe the story of "an accused murderer." To suggest that because someone is

---

[20] HRE Rule 703, "Bases of opinion testimony by experts," states as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

[21] See also note 14, supra.

accused of a crime, an expert witness should not consider that person's version of events undermines the presumption of innocence and is an insinuation which may constitute misconduct. Cf. State v. Austin, 143 Hawai'i 18, 40-41, 422 P.3d 18, 40-41 (2018) ("[T]he prosecutor's remark regarding whether [the defendant's] testimony was corroborated by other evidence may also have qualified as misconduct to the extent that it might infer that [the defendant] had a burden to produce evidence tending to corroborate his testimony.").

Most importantly, however, the Lankford and Higa cases are perhaps two of the most highly publicized, notorious death cases in this jurisdiction's recent history. To lay a foundation, the prosecutor engaged Dr. Navin in a series of questions vividly recalling the troubling and gruesome facts of those cases, thereby linking Dr. Navin with notorious murder defendants. All of the questions directed to Dr. Navin regarding the Lankford and Higa cases may well have served to inflame the jury against an expert who had testified for the defense in those cases.

Udo also challenges the Lankford Closing Remark and the Higa Closing Remark as misconduct, again arguing that the remarks were only intended to inflame the passions of the jury and to create hostility towards Dr. Navin. The State contends the ICA correctly held that the DPA was within the wide latitude

afforded to prosecutors in closing argument to draw inferences from the testimony.

Granted, it is well-established that prosecutors are afforded wide latitude in closing to discuss the evidence, and may "state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence." State v. Clark, 83 Hawai'i 289, 304, 926 P.2d 194, 209 (1996) (citations omitted). In all stages of trial, however, a prosecutor remains bound by the duty to "seek justice, not merely to convict." Rogan, 91 Hawai'i at 412, 984 P.2d at 1238 (citations omitted).

The Minnesota Supreme Court addressed a situation similar to this case in State v. Blasus, 445 N.W.2d 535 (Minn. 1989). It held a district court erred when it allowed cross-examination of two defense expert witnesses on their past testimony in cases where "[t]he murders referred to were gruesome and reprehensible . . . ." 445 N.W.2d at 540. Although the State of Minnesota argued the cross-examination was necessary to demonstrate the expert witnesses' defense bias, the Blasus court found the prosecution had already elicited testimony from the experts to establish a defense bias, such as the number of times they had testified for the defense. 445 N.W.2d at 539. The Blasus court explained that it recognized the value of revealing witness bias, but prosecutors are more limited than their civil

counterparts in cross-examination because of their mandate to seek justice, "not merely to convict":

> In assessing the propriety of the prosecutor's cross-examination, we are keenly aware of the need to preserve counsel's ability to question adverse witnesses. The truth-seeking function of the courts is best served when counsel is allowed to seek and reveal hidden prejudice, bias, or other factors which may color a witness's testimony and affect its reliability. In the civil context, where the need for certainty is less, an appellate court may be less inclined to intrude on the trial court's discretion in weighing prejudicial effect of evidence against its probative value.
>
> By its very nature, however, the criminal context is different. Attorneys who prosecute criminal cases are charged with responsibilities to the court, to the constitution, and to the defendant not present in civil cases. "The duty of the prosecutor is to seek justice, not merely to convict." ABA Standards Relating to the Prosecution Function, Standard 1.1(c); See also, National District Attorneys Association, National Prosecution Standards, Standard 176 and commentary p. 248-249 (1977)[.] These additional responsibilities limit the scope of proper conduct of prosecutors to a narrower field than is available to their civil law counterparts.

445 N.W.2d at 539-40.

Accordingly, the Blasus court found "the prosecution intended the jury to mentally link appellant with the frightening violence of these other cases" through the cross-examination regarding the experts' testimony as to "gruesome and reprehensible" murders. 445 N.W.2d at 540. Thus, the Blasus court held "the prosecutor's questioning of defense expert witnesses as to their prior participation in specific, notorious[,] and highly publicized murder cases was improper . . . ." 445 N.W.2d at 541.

As this court recently reiterated in Pasene, "prosecutors 'should not use arguments calculated to inflame the passions or prejudices of the jury[,]' as '[a]rguments that rely on . . . prejudices of the jurors introduce into the trial elements of irrelevance and irrationality that cannot be tolerated.'" Pasene, 144 Hawaiʻi at 370, 439 P.3d at 895 (quoting Rogan, 91 Hawaiʻi at 413, 984 P.2d at 1239). In Pasene, a prosecutor likened the presumption of innocence applied to the defendant in that case as the same presumption applied to John Gotti and Charles Manson. 144 Hawaiʻi at 357, 439 P.3d at 882. An objection was made by defense counsel and immediately sustained; the court instructed the jury to disregard the statements. Id.

We held that although it could not be said that the DPA's statement "was calculated to inflame the passions or prejudices of the jury, that was likely the result." 144 Hawaiʻi at 370, 439 P.3d at 895 (emphasis in original). We explained that "referencing such notorious examples of heinous murderers during the State's rebuttal closing in a murder trial may lead the jury to react based on emotion, rather than in an objective way, and threatens to introduce 'an atmosphere of bias and prejudice' as the jury enters deliberation." Id. (quoting State v. Kahalewai, 55 Haw. 127, 129, 516 P.2d 336, 338 (1973)).

What is important in this case is that whether or not the references "were <u>calculated</u> to inflame the passions or prejudices of the jury, that was the likely result." 144 Hawai'i at 370, 439 P.3d at 895 (emphasis in original). "As an officer of the court, the prosecutor is expected to know and abide by the standards of professional conduct, to operate in accordance with the interests of justice, and to act with due regard for fairness and the rights of the defendant." <u>Pasene</u>, 144 Hawai'i at 371, 439 P.3d at 896 (citing Standards for Criminal Justice, Standards No. 3-1.2, 3-1.9 (ABA 2015)). The Lankford and Higa References may well have served to inflame the passions of the jury against an expert who had testified for the defense in those cases. We therefore conclude that the Lankford and Higa References were improper.

We pause in our analysis to note that the ICA stated the Lankford and Higa References were not improper because they did not rise "to the level of misconduct in <u>Rogan</u> . . . ." <u>Udo</u>, SDO at 5. In <u>Rogan</u>, we held a prosecutor's rebuttal argument statement -- "This is every mother's nightmare. Leave your daughter for an hour and a half, and you walk back in, and here's some black, military guy on top of your daughter" -- constituted misconduct because it was an impermissible appeal to racial prejudice. <u>Rogan</u>, 91 Hawai'i at 412, 984 P.2d at 1238.

We held that the misconduct was so egregious that it was necessary to reverse the defendant's judgment of conviction and sentence and that retrial was barred by the double jeopardy clause of article I, section 10 of the Hawai'i Constitution.  91 Hawai'i at 408, 984 P.2d at 1234.

Rogan is not a floor for establishing whether challenged prosecutorial conduct is improper, but is rather illustrative of an extreme instance of misconduct.  As we explained in Maluia, "the term 'prosecutorial misconduct' is a legal term of art that refers to any improper action committed by a prosecutor, however harmless or unintentional."  107 Hawai'i at 25, 108 P.3d at 979 (emphasis in original).  For example, we have also found that a prosecutor's remarks or questions were improper when they pointed to the consequences of a jury's verdict, State v. Tuua, 125 Hawai'i 10, 14, 250 P.3d 273, 277 (2011); did not draw legitimate inferences from the testimony at trial, State v. Marsh, 68 Haw. 659, 660, 728 P.2d 1301, 1302 (1986); or expressed a personal opinion as to what an "innocent" person who have said or done, State v. Mainaaupo, 117 Hawai'i 235, 254–55, 178 P.3d 1, 20–21 (2008).

Rather, "the level of misconduct in Rogan" was relevant to the third factor of the prosecutorial misconduct analysis, i.e., (1) if prosecutorial misconduct occurred (2) that was not

48

harmless beyond a reasonable doubt, (3) "whether the misconduct was so egregious as to bar reprosecution." Maluia, 107 Hawai'i at 25-26, 108 P.3d at 979-80. In Rogan, it was. Thus, the ICA erred in considering Rogan as a threshold in addressing whether misconduct occurred, which is the first factor of the prosecutorial misconduct analysis.

## C. Whether the Misconduct Was Harmless Beyond a Reasonable Doubt

In addressing the second factor of the prosecutorial misconduct analysis, whether alleged misconduct was plain error affecting Udo's substantial rights and therefore not harmless beyond a reasonable doubt, this court considers three prongs: "the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against the defendant." Iuli, 101 Hawai'i at 208, 65 P.3d at 155 (citations omitted).

### 1. Nature of the misconduct

As we noted earlier, "'prosecutorial misconduct' is a legal term of art that refers to any improper action committed by a prosecutor, however harmless or unintentional." Maluia, 107 Hawai'i at 25, 108 P.3d at 979. We further stated in Maluia:

> [T]here are varying degrees of prosecutorial misconduct . . . . [M]ost cases . . . do not involve prosecutors who intend to eviscerate the defendant's constitutional and statutory rights . . . .

> Nevertheless, we decline to create a separate category of prosecutorial "mistake" or "error."  There are three reasons why we believe that our current method of analysis -- in which all improper conduct is labeled "prosecutorial misconduct" -- is more appropriate.
>
> First, there is no need to create separate categories because this court already distinguishes innocuous prosecutorial misconduct from more serious deceitful behavior . . . .  In sum, whenever a defendant alleges prosecutorial misconduct, this court must decide: (1) whether the conduct was improper; (2) if the conduct was improper, whether the misconduct was harmless beyond a reasonable doubt; and (3) if the misconduct was not harmless, whether the misconduct was so egregious as to bar reprosecution.  In the course of making these three determinations, the seriousness of the misconduct becomes evident, and we need not attach a separate label for our disposition to be clear.  Consequently, a separate label for "misconduct" cases and "error" cases is unnecessary.
>
> Second, a finding of "prosecutorial misconduct" is not equivalent to a finding of "professional misconduct" pursuant to the Hawai'i Rules of Professional Conduct (HRPC), and a prosecutor need not face disciplinary sanctions merely because we have used the term "prosecutorial misconduct." . . . .
>
> Third, we believe that separate nomenclature for different types of prosecutorial misconduct would lead to protracted litigation over semantics; this would place an additional burden on our courts with no corresponding benefit.

Maluia, 107 Hawai'i at 25-26, 108 P.3d at 979-80.

As in Blasus, the DPA's conduct in this case "mentally link[ed] [the defendant] with the frightening violence of these other cases" through the cross-examination regarding the experts' testimony as to "gruesome and reprehensible" murders, and was improper for the reasons explained.  445 N.W.2d at 540.  Also, Dr. Navin was Udo's only witness and was critical to her defense.  Therefore, as in Pasene, this prong weighs in favor of

vacating Udo's conviction.  Pasene, 144 Hawai'i at 371, 439 P.3d at 896.

### 2. Promptness or Lack of a Curative Instruction

As to the second prong of the harmless beyond a reasonable doubt analysis, there was no objection and the court did not provide any curative instruction after the improper Lankford and Higa References.  In Pasene, there was an objection and curative instruction given for the prosecutor's brief likening of the defendant to John Gotti and Charles Manson; we noted that the curative instruction, however, "may not have sufficiently negated the prejudicial impact of the DPA's statement."  144 Hawai'i at 370-71, 439 P.3d at 895-96.  Unlike in Pasene, at Udo's trial (1) there were multiple references to Lankford and Higa, both local cases in which Dr. Navin had testified; and (2) Udo's defense rested entirely on the trustworthiness of Dr. Navin's testimony.  Thus, even if a curative instruction had been given, "it may not have sufficiently negated the prejudicial impact of the DPA's statement[s]."  See id.  The second prong therefore also weighs heavily in favor of a finding of that the misconduct was not harmless beyond a reasonable doubt.  See Wakisaka, 102 Hawai'i at 516, 78 P.3d at 329 (lack of curative instruction weighed in defendant's favor).

51

### 3.  Strength or Weakness of Evidence

In considering the final prong of the harmless beyond a reasonable doubt analysis, we review the evidence presented to the jury to determine whether the evidence was so overwhelmingly strong that there is not "a reasonable possibility that the error complained of might have contributed to" Udo's conviction. Underwood, 142 Hawai'i at 329, 418 P.3d at 670 (citation omitted).

The jury found Udo guilty of the included offense of reckless manslaughter in violation of HRS § 707-702(1)(a). Thus, the jury determined that Udo caused Wollaston's death, but did so with a less culpable state of mind than that necessary for second degree murder.  Compare HRS § 707-702(a)(1) with HRS § 707-701.5.

Dr. Navin, Udo's only witness, opined that Wollaston's death could have been caused by a heart attack and not by the injuries inflicted by Udo, as explained in more detail in Section II.B.1.b above.

On the other hand, the State elicited the following evidence to support Udo's manslaughter conviction.

First, there was no real dispute as to Udo's identity as the woman who attacked Wollaston and that Wollaston died the morning of July 21, 2014.  Regarding the cause of death,

Paramedic Kihe testified (1) Wollaston appeared to have died from a "closed head injury;" and (2) Wollaston did not exhibit signs of a heart attack.  Kingston also described that Wollaston had "no motion" after the "final blow," and his testimony of Wollaston's behavior did not include any of the tell-tale signs Kihe and Dr. Navin explained for someone experiencing a heart attack (chest pain, shortness of breath, nausea, vomiting, and dizziness).

Also, Dr. Happy, the medical examiner and board-certified in anatomical and forensic pathology, not only testified Wollaston had several head injuries consistent with a punch, kick, or stomp, including a laceration in her brainstem and hemorrhaging in multiple places in her brain, he also opined that Wollaston's death was caused by "blunt force head and neck injury," and the "mechanism of death" was subarachnoid hemorrhaging around the brainstem.

The State also presented evidence to discredit Dr. Navin's theory that Wollaston was experiencing a heart attack prior to entering into the altercation with Udo and his theory that the increased stress of the fight caused her death.  Dr. Navin's opinion was based on Wollaston's alleged long history of alcoholism, drug abuse, including marijuana and methamphetamines, and substandard living experience as a

constellation of factors leading to the heart attack. The State, however, also elicited evidence during cross-examination of Dr. Navin that (1) contraction band necrosis is not a specific finding and could be attributed to epinephrine or other causes; (2) a neck injury like Wollaston's could be fatal; (3) Dr. Navin did not examine the slide of Wollaston's brainstem prior to submitting his expert report; and (4) Wollaston's blood contained an inactive component of THC not likely to increase risk of a heart attack.

Through Dr. Happy's rebuttal examination, the State also presented evidence that (1) Wollaston had four different sources of epinephrine on the morning of July 21, 2014; (2) Wollaston did not have atherosclerosis, a condition possibly necessary to support Dr. Navin's timeline that Wollaston began experiencing a heart attack four hours prior to the altercation with Udo; (3) Wollaston's increased heart weight was due to hypertension, a condition which does not contribute to heart attack risk; (4) Wollaston's heart and liver did not evince chronic alcoholism; and (5) there was nothing in Wollaston's medical record indicating methamphetamine use. The circuit court had also instructed the jury to disregard any statements Dr. Navin made related to Wollaston only "blocking punches" after she fell,

which Dr. Navin repeatedly testified was a basis for his opinion that Wollaston was experiencing a heart attack.

Taken together, the State presented strong evidence that Wollaston died from blunt force head injuries recklessly caused by Udo.  The evidence, however, is not so overwhelmingly strong to meet the high threshold of harmless beyond a reasonable doubt.  The only eyewitness to the incident to testify for the State, Kingston, was a friend of the decedent and had been consuming significant amounts of vodka leading up to the early morning incident.  Kingston testified that Wollaston voluntarily entered into a fight with Udo, then Udo and Wollaston fell over Clinton.  Although he testified that Udo kicked Wollaston in the head while she was down several times, Kingston also testified that "to the final blow [Wollaston] was motionless."  He did not testify that Wollaston was conscious after falling to the ground with Udo.

Dr. Navin, Udo's only witness, then opined regarding another possible cause of Wollaston's death.  He testified that upon reviewing Wollaston's autopsy report, he noticed indications of previous heart damage, including the presence of boxcar nuclei, which could increase the risk of heart attack. He also testified that Wollaston's blood alcohol level was 0.278, and there was evidence of marijuana in high levels, which

could increase the risk of heart attack. He also testified that Wollaston's heart was abnormally large, and that the contraction band necrosis revealed after he had requested reslicing of the paraffin slides was more likely from a heart attack.

Therefore, it cannot be said beyond a reasonable doubt that the DPA's inflammatory questions and closing argument did not draw unfair scorn and prejudice to Udo's sole witness upon whose testimony her defense rested. See Tuua, 125 Hawai'i at 17, 250 P.3d at 280 (holding that where the credibility of witnesses in trial was pivotal, improper comments impugning credibility weighed against harmlessness). Thus, there is a reasonable possibility that the misconduct might have contributed to Udo's conviction. See Underwood, 142 Hawai'i at 328, 418 P.3d at 669.

As a result, the prosecutorial misconduct in this case was not harmless beyond a reasonable doubt and affected Udo's right to a fair trial. We therefore notice plain error for the violation of Udo's substantial right to a fair trial.

D.  **Whether the Misconduct Was so Egregious as to Bar Reprosecution**

Having determined that the first two factors of the prosecutorial misconduct analysis have established prosecutorial misconduct requiring vacation of Udo's conviction, we must now address the third factor, whether the misconduct was so

egregious as to bar reprosecution.  Maluia, 107 Hawaiʻi at 25-26, 108 P.3d at 979-80.

Although we hold that the DPA's misconduct deprived Udo of her right to a fair trial, we do not find that the conduct was so egregious as to bar retrial under the double jeopardy protections of article I, section 10 of the Hawaiʻi Constitution. See Underwood, 142 Hawaiʻi at 329, 418 P.3d at 670 ("Our decisions do not provide bright line rules for determining when misconduct is sufficiently egregious to bar retrial, but we have emphasized that it is a 'much higher standard than that used to determine whether a defendant is entitled to a new trial.'").

## V.    Conclusion

For the reasons discussed, we therefore vacate the ICA's August 3, 2018 Judgment on Appeal and the circuit court's September 13, 2016 Judgment of Conviction and Sentence, and remand the case to the circuit court for further proceedings consistent with this opinion.

William H. Jameson, Jr.
for petitioner

Brandon H. Ito
and Sonja P. McCullen
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

